Joseph M. Kar (SBN 207414)
**LAW OFFICE OF JOSEPH M. KAR, PC**
15250 Ventura Blvd., Suite PH-1220
Sherman Oaks, CA 91403
Telephone:  (818) 501-6930
Facsimile:   (818) 501-6935

Gerald L. Kroll, Esq. (SBN 066493)
**KROLL LAW FIRM**
970 West Broadway, Ste. E-200
Jackson, WY 83001
Tel: 310-598-1255

Attorneys for PLAINTIFFS, LEVI COBOS, individually, and those similarly situated,

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT IN STATE OF CALIFORNIA

| | |
|---|---|
| **LEVI COBOS**, an individual and those similarly situated,<br><br>Plaintiff(s),<br><br>v.<br><br>**ROBINHOOD FINANCIAL LLC**, a business form unknown**;  ROBINHOOD SECURITIES, LLC**, a business form unknown; **ROBINHOOD MARKETS, INC.**, a business form unknown; and **DOES 1 through 1000**, inclusive,<br><br>Defendant(s), | USDC Case No.:  21-CV-00843<br><br>[Class Action and Business & Professions Code § 17200]<br><br>[Assigned to Honorable Christina A. Snyder, in Courtroom 8D of the First Street Courthouse, for all purposes including trial]<br><br>**MEMORANDUM OF LAW IN SUPPORT OF EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND/OR OSC RE: PRELIMINARY INJUNCTION;DECLARATIONS OF LEVI COBOS AND JOSEPH M. KAR, ESQ. AND EXHIBITS 1 TO 4 HERETO**<br><br>**DATE:  2/4/2021**<br>**CTRM:  8D** |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF LEVI COBOS' *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC RE: PRELIMINARY INJUNCTION

1

## **TABLE OF CONTENTS**

2

3   I.      INTRODUCTION & BASIC FACTS                                          **4**

4   II.     EX PARTE NOTICE WAS DULY PROVIDED                                    **7**

    III.    THE TEMPORARY RESTRAINING ORDER SHOULD RESTORE FULL FUNCTION
5           AND RESTRAIN FURTHER INSTANCES UNLESS OTHERWISE

6           ORDERED                                                              **7**

7   IV.     THE LAW ON TEMPORARY RESTRAINING ORDERS AND OSC RE:

8           PRELIMINARY INJUNCTIONS INVOLVING MARKET

9           MANIPULATIONS                                                        **8**

10  V.      PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS AND HAS SUFFERED

            IRREPARABLE HARM                                                     **10**
11
            A.  THE FIRST CAUSE OF ACTION FOR VIOLATION OF MANIPULATION
12              STANDARDS PERMITS A TRO/OSC: PI                                  **11**

13          B.  THE SECOND CAUSE OF ACTION FOR CFAA, ALSO MERITS A TRO/OSC

14              RE: PI                                                           **13**

15          C.  UNLAWFUL AND UNFAIR BUSINESS PRACTICES LAW ALLOWS FOR

16              INJUNCTIVE RELIEF                                                **15**

    VI.     PLAINTIFF, THE PROPOSED CLASS, AND THE INVESTING PUBLIC SUFFER
17          IRREPARABLE HARM AS A RESULT OF THE MARKET

18          MANIPULATION                                                         **17**

19  VII.    BALANCING OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR

20          GRANTING RELIEF                                                      **17**

21  VIII.   THE COURT SHOULD SET A NOMINAL BOND OF $1,000 AT MOST SINCE

22          ROBINHOOD IS ONLY REQUIRED TO ADHERE TO NORMAL OPERATING

23          STANDARDS                                                            **18**

    IX.     CONCLUSION                                                           **19**
24
    DECLARATION OF LEVI COBOS IN SUPPORT                                         **20**
25
    DECLARATION OF JOSEPH M. KAR, ESQ. IN SUPPORT                                **24**

26

27

28

1

<u>**TABLE OF AUTHORITIES**</u>

2

<u>**Other Sources, Statutes & Laws**</u>

| | |
|---|---|
| 11A Wright & Miller, Federal Practice and Procedure (3d ed. rev. 2014) | **10** |
| 15 USC § 78i | **11-13, 17-18** |
| 18 USC § 1030 | **13-14, 17** |
| Business & Professions Code § 17200 | **16** |
| Business & Professions Code § 17203 | **17** |

6

<u>**Case Laws**</u>

| | |
|---|---|
| Onel v. Top Ships, Inc., 806 Fed. Appx. 64 (2nd Cir., 2020) | **5-6** |
| SEC v. RESCH-CASSIN & CO., 362 F. Supp. 964 (S.D.N.Y., 1993) | ***Passim*** |
| Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, Fed. Sec. L. Rep. (CCH) ¶ 92532, Fed. Sec. L. Rep. (CCH) ¶92532 (2d Cir. 1969) | **6-7** |
| Securities & Exchange Com. v. Torr, 22 F. Supp. 602, 1 SEC Jud. Dec. 489 (S.D.N.Y. 1938) | **6** |
| Hoffman v. Int'l Longshoremen's & Warehousemen's Union, Local No. 10, 492 F.2d 929 (9th Cir. 1974) | |
| Pom Wonderful LLC v. Hubbard, 775 F.3d 1118 (9th Cir. 2014) | **8** |
| Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7 (2008) | **8, 10** |
| Washington v. Trump, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) | **8** |
| Alliance For The Wild Rockies v. Cottrell, 632 F.3d 1127 (9th Cir. 2011) | **8** |
| Arc of Cal. v. Douglas, 757 F.3d 975 (9th Cir. 2014) | **8-9, 17** |
| Trane Co. v. O'Connor Securities, 561 F. Supp. 301 (S.D.N.Y. 1983) | **9** |
| SEC v. Malenfant, 784 F. Supp. 141 (S.D.N.Y, 1992) | **9** |
| Jewelcor, Inc. v. Pearlman, 397 F. Supp. 221 (S.D.N.Y., 1975) | **9** |
| Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668 (9th Cir. 1988) | **10** |
| Spark Indus., LLC v. Kretek Int'l, Inc., No. CV 14-5726-GW(ASX), 2014 WL 12600262 (C.D. Cal. July 29, 2014) | **10** |
| Charles Hughes & Co. v. SEC, 139 F.2d 434 (2d Cir. 1943) | **10-11** |
| FTC v. Swedish Match N. Am., Inc., 131 F. Supp. 2d 151 (D.D.C. 2000) | **11** |
| Estes Forwarding Worldwide LLC. v. Cuellar, 239 F. Supp. 3d 918 | **14** |
| United States v. Raisley, 466 Fed. Appx. 125 (3rd Cir. 2012) | **14-15** |
| United States v. John, 597 F.3d 263 (5th Cir. 2010) | **15** |
| Brown Jordan Int'l, Inc. v. Carmicle, 846 F.3d 1167 (11th Cir. 2017) | **15** |
| People ex rel. Mosk v. Natal Research Co. of Cal., 201 Cal.App.2d 765 (Cal.Ct.App. 1962) | **16** |
| Wickersham v. Crittenden, 93 Cal. 17 (Cal.Sup.Ct. 1892) | **16** |
| Roman v. Ries, 259 Cal.App.2d 65 (Cal.Ct.App. 1962) | **16** |
| IT Corp. v. County of Imperial, 35 Cal.3d 63 (Cal.Sup.Ct. 1983) | **16, 18** |
| Saunders v. Superior Court, 27 Cal. App.4th 832 (Cal.Ct.App. 1994) | **17** |
| State Farm Fire & Casualty Co. v. Superior Court, 45 Cal.App.4th 1093 (Cal.Ct.App. 1996) | **17** |
| Ms. L. v. ICE, 310 F. Supp. 3d 1133 (S.D.Cal. 2018) | **17** |
| N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dep't of Educ., 600 F.3d 1104 (9th Cir. 2010) | |
| Small v. Avanti Health Sys., LLC, 661 F.3d 1180 (9th Cir. 2011) | **18** |
| Univ. of Texas v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830 (1981) | **19** |

1    I.      **INTRODUCTION & BASIC FACTS.**

2           Allowing any stock brokerage firm to suddenly, and without advance warning,

3    suspend one-side of all transactions in a stock or selectively, creates a lack of symmetry

4    that disrupts the natural order of supply and demand within our securities exchange

5    markets.  But, on January 28, 2021, Defendants, ROBINHOOD FINANCIAL LLC;

6    ROBINHOOD SECURITIES, LLC; and ROBINHOOD MARKETS, INC., (collectively

7    hereinafter "Robinhood.") did just that: they  disabled the "buy" feature on their "app" – an

8    unprecedented action - stranding its more than 10,000,000 retail customers and subjecting

     them to increased risks and losses.

9           Robinhood continues to engage in the same conduct, unabated, costing Plaintiff and

10   those similarly situated to suffer loss and damage as a result.  This type of unnatural market

11   manipulation continues to occur unabated and expanded, by all current public reports and

12   accounts of Robinhood's activities.  The *ex parte* application reflects the urgency and

13   irreparable harm from this unprecedented action that unbalances  an already volatile stock

14   market.

15          Robinhood, a licensed broker/dealer, markets itself as a "start-up" stock brokerage,

16   catering to younger and more inexperienced retail customers who may be interested in

17   smaller investments in the stock exchanges.  To entice individuals to invest, it offers free

18   stock brokerage accounts with no transaction fees.  Small retail investors can download

19   Robinhood's app, which allows customers/users to open an account and begin trading on

20   the various exchanges and cryptocurrency markets without a transaction fee.  With that

21   business model, Robinhood has succeeded in amassing over 10,000,000 downloads on its

22   app, together with cash deposits that enable users to buy or sell stocks or derivatives on the

     Robinhood trading platform.

23          These retail customers were and are given direct access to regulated stock

24   exchanges and markets through the Robinhood app, shortly after making their respective

25   deposits with Robinhood.  To accomplish that, Robinhood maintains the retail customer's

26   liquid money on deposit before any "buy" order is accepted or executed so that it could draw

27   upon those sums for settlement when necessary.

28          Thus, in order to "buy" or "sell" a stock or option, for example, a retail customer with a

Robinhood account, simply selects the correct stock symbol and depresses the desired "buy" or "sell" feature/ button on the app, and thereby seamlessly places an order on regulated securities exchanges. But, unbeknownst to retail customers, before this trading action occurs, Robinhood's trading platform had a built in an internal ability to suspend or disable the "buy" feature (and presumptively the "sell" feature) so that retail customers would not be able to access transactions on its platforms to purchase.

On January 27, 2021, various news and media outlets reported that the shares of Gamestop (NYSE: GME), AMC Theatres (NYSE: AMC), Blackberry (NYSE: BB), and others were being heavily traded by small retail investors from Robinhood and others brokerages, in a showing of social dissidence against certain hedge funds and institutional investors that "bet against" socially favored companies impacted by the Covid-19 pandemic, by short selling large amounts of shares and options in companies such as GME, AMC, and BB.

Short selling is the practice of selling shares of a listed company (on a regulated stock or futures exchange) for the then current market price until such time as the brokerage firm requires that customer to close out the position, which in effect is equivalent to selling shares that the customers does not own,--but which s/he "borrows" for a period of time from the brokerage. If the stock price falls below the short sale price in the near future, the investor usually purchases the shares on the open market for a lower price, thus making a profit. Analogously, short selling is not to dissimilar to making a "Come" bet in a Las Vegas type "Craps" game and likely draws the same risks of profit or loss.

On January 28, 2021, plaintiff, LEVI COBOS, attempted to use the Robinhood app to try to "buy" shares of AMC - but the "buy" feature/button was shaded gray and disabled. **L. Cobos ¶¶5-6, 10-11**; **Exhibit 1**. That same day, Mr. Cobos attempted to use the Robinhood app to "buy" an option in BB, but the "buy" feature/button for that stock was likewise shaded gray and disabled. **L. Cobos ¶¶8-11**; **Exhibit 2**. When Mr. Cobos attempted to use those "buy" features/buttons, the Robinhood app instead displayed an error message indicating that the "buy" feature was not available at the time with no further information.

"Manipulation 'connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.' Id. at 130 (*internal*

quotation marks omitted)…."*The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand*." Id. (*quoting* Gurary v. Winehouse, 190 F.3d 37, 45 (2d Cir. 1999)). To determine whether activity falls outside that 'natural interplay,' ' 'courts generally ask whether a transaction sends a false pricing signal to the market.' ' Id. (*quoting* ATSI, 493 F.3d at 100). Lastly, to be manipulative, the market activity in question 'must involve misrepresentation or nondisclosure.' Id." Onel v. Top Ships, Inc., 806 Fed. Appx. 64, 67 (2nd Cir., 2020) (underscore and *italics* added).

Here, there was also no notice of any kind before the disabling of the "natural interplay" of supply and demand, since the purchase of shares was suspended unpredictably (and Robinhood claims right to do so again without impunity), and the the "buy" feature/button was disabled  on the eve of stock option expirations - including BB - set to occur the following day.  **L. Cobos ¶¶11-13**.  Unbeknownst to Plaintiff, and likely most if not all of Robinhood's retail customers prior to this action, a hedge fund, "Citadel," who was reportedly a major early investor in Robinhood's business according to various news and media outlets, held substantial short sell investments positions at the time of Robinhood's disruption and after.  Those same reports referenced billions of dollars being lost by the short sellers.

Robinhood's CEO, Vladimir Tenev, publicly announced on television, on January 28, 2021, that he had implemented the halting of purchasing of selective stocks to be "proactive."  **Kar Decl., ¶3**.  He proposed that Robinhood acted, as it did, to avoid future clearinghouse and liquidity difficulties of some kind.  But, he did not explain how halting trading on purchases on liquid accounts was problematic, and there was no indication that Robinhood was illiquid or reaching illiquidity at any time.  Even if no fees are charged,

> [b]y engaging in transactions with the public, a broker-dealer certainly represents that it is solvent. In addition to a representation as to its solvency, a broker-dealer also impliedly represents that the price of a transaction is reasonably related to a price prevailing in a market that is free, open and competitive.

SEC v. RESCH-CASSIN & CO., 362 F. Supp. 964, 978 (S.D.N.Y., 1993); see also Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, Fed. Sec. L. Rep. (CCH) ¶ 92532, Fed. Sec. L. Rep. (CCH) ¶92532 (2d Cir. 1969), *cert. denied*, 400 U.S. 822, 91 S. Ct. 41, 27 L.

Ed. 2d 50 (1970) [When person who has substantial, direct, pecuniary interest in success of proposed offering takes active steps to effect rise in market in such security, finding of manipulative purpose is prima facie established]; <u>Securities & Exchange Com. v. Torr</u>, 22 F. Supp. 602, 1 SEC Jud. Dec. 489 (S.D.N.Y. 1938).

Also, Defendants had an undisclosed conflict of interest.  Its major investor, Citadel, at the time, had reportedly held large short positions in the same stocks for which Robinhood selectively prevented stock share purchases. Thus, Mr. Cobos, and those similarly situated were deceived into believing that they were trading on a platform adequately capitalized and free of conflicts of interest, which permitted for symmetrical transactions that enabled buying and selling of stocks without restrictions.

Indeed, at no time did any of the market regulators, such as the Securities Exchange Commission ("SEC"), or other government agencies such as the Federal Trade Commission or otherwise, issue any orders telling Robinhood to disrupt the natural supply and demand of stocks among its customers.  As such, there can be no dispute that Robinhood's acts interfered with the natural supply and demand of without order or prior notice of any kind, and selectively halted purchasing of stocks (or derivatives) among its polarized retailer customers.

Therefore, issuance of this Court's TRO to restore full functionality to the Robinhood app until further order of this Court or any government agency, is warranted.

## II.   EX PARTE NOTICE WAS DULY PROVIDED.

Local Rule 7-19 requires prior notice of 48 hours after moving papers are served.  In this case, the moving papers were provided on February 2, 2021, and the hearing on this ex parte application for a temporary restraining order, OSC re: preliminary injunction, set for February 4, 2021 in dept. 8D before this honorable Court.  **Kar Decl., ¶2.**

## III.   THE TEMPORARY RESTRAINING ORDER SHOULD RESTORE FULL FUNCTION.

The instant ex parte application seeks to prevent further injury and harm to Plaintiff and those similarly situated by the limitation and restriction of the ability to purchase securities on the Robinhood app or its transaction platform.  As such, the instant application seeks this Court's order restoring the full function (buy or sell) unless otherwise ordered by this Court or a government agency.  Accordingly, this Court's order is proper and

1 | necessary.

2 | **IV.    THE LAW ON TEMPORARY RESTRAINING ORDERS AND OSC RE:**
**PRELIMINARY INJUNCTIONS INVOLVING MARKET MANIPULATIONS.**

3 |

4 | A temporary restraining order ("TRO") is to "preserve the status quo pending a

5 | hearing."  Hoffman v. Int'l Longshoremen's & Warehousemen's Union, Local No. 10, 492

6 | F.2d 929, 933 (9th Cir. 1974), *aff'd sub nom.*  Muniz v. Hoffman, 422 U.S. 454 (1975).  That

7 | is all Plaintiff, LEVI COBOS, seeks here–the free and natural course of purchases and sales

8 | of stocks or derivatives on the Robinhood app such that all of its retail customers are

9 | afforded the same and equal investment opportunities as any other retail customer of a

stock brokerage firm.

10 | An application/motion for a TRO or preliminary injunction requires the Court to make

11 | four findings with respect to the moving party, that, "(1) it is likely to succeed on the merits;

12 | (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance

13 | of equities tips in its favor; and (4) an injunction is in the public interest."  Pom Wonderful

14 | LLC v. Hubbard, 775 F.3d 1118, 1124 (9th Cir. 2014) (*citing* Winter v. Natural Res. Def.

15 | Council, Inc., 555 U.S. 7, 20 (2008)).

16 | Importantly, a plaintiff seeking preliminary relief under Federal Rule of Civil

17 | Procedure 65 must establish "that he is likely to succeed on the merits, that he is likely to

18 | suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips

19 | in his favor, and that an injunction is in the public interest."  Winter v. Nat'l Res. Def.

20 | Council, Inc., 555 U.S. 7, 20 (2008); Washington v. Trump, 847 F.3d 1151, 1159 n.3 (9th

21 | Cir. 2017) (noting standards for issuing temporary restraining orders and preliminary

22 | injunctions are "substantially identical").  Since these elements are balanced against each

other, "a stronger showing of one element may offset a weaker showing of another."

23 | Alliance For The Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).

24 | Thus, when the likelihood of grave irreparable injury is palpable and the balance of

25 | equities tips sharply in plaintiffs' favor, the plaintiff need only "demonstrate a fair chance of

26 | success on the merits or questions serious enough to require litigation."  Arc of Cal. v.

27 | Douglas, 757 F.3d 975, 993-94 (9th Cir. 2014) (internal quotations and citation omitted).

28 | Relative to this kind of action, one court wisely expressed that, " 'The central purpose of

section 9(a) [of the '34 Act] is *not* to prohibit market transactions which may raise or lower the price of securities, *but to keep an open and free market where the natural forces of supply and demand determine a security's price.*' Trane Co. v. O'Connor Securities, 561 F. Supp. 301, 304 (S.D.N.Y. 1983) *citing* Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 383 (2d Cir.), *cert. denied*, 414 U.S. 910, 38 L. Ed. 2d 148, 94 S. Ct. 231, 94 S. Ct. 232 (1973)." SEC v. Malenfant, 784 F. Supp. 141, 144 (S.D.N.Y, 1992) (*italics* added). When a broker/dealer creates a platform serving millions of retail customers that can restrict or entirely stop the flow of purchasing or sales, the Court's temporary restraining order (and subsequent preliminary injunction) is imperative.

In Jewelcor, Inc. v. Pearlman, 397 F. Supp. 221 (S.D.N.Y., 1975), the court specified that a preliminary injunction required, "a clear showing of either (1) probable success on the merits and possible irreparable injury, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Id. at 236-237 (*quoting* Sonesta International Hotels Corp. v. Wellington Assoc., 483 F.2d 247, 250 (2d Cir. 1973).)  Here, Plaintiff is able to satisfy *all four* of the ordinary conditions for relief.

The disabling of the "buy" feature on its app, stopping purchasing entirely of those affected stocks and derivatives, was done unpredictably so that no notice or other options for purchasing were made available at all.  Robinhood is likely to argue that it acted without intent to manipulate the price of stocks, but rather it was acting to protect itself or its retailer customers.  But its actions were not aimed at protecting any of its retail customers who sought to purchase the subject stocks, who only experienced the disabled "buy" features/buttons.  The Legislative intent confirms that fraudulent or manipulative intent is satisfactorily proven by a showing of *scienter by mere lack of diligence or unreasonable or negligent conduct*, as in this case with Robinhood.

The Exchange Act does *not* contain any expression of legislative intent requiring a showing of specific fraudulent intent in order to violate its provisions. The only form of scienter required, in order for one to violate Rule 10b-5, is merely "lack of diligence, constructive fraud, or unreasonable or negligent conduct." SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 855 (2d Cir. 1968), cert. denied, 404 U.S. 1005, 92 S. Ct. 561, 30 L. Ed. 2d 558 (1971), *reh. denied*, 404 U.S. 1064, 92 S. Ct. 733, 30 L. Ed. 2d 753 (1972).  No purpose would be served in further recitals of the

activities of these defendants. The facts compel the conclusion that defendants knew what was happening, and if, in certain instances, they did not, such "innocence" can be attributed only to lack of diligence or negligence. Furthermore, by their actions, they made possible the fraudulent and manipulative conduct of Resch-Cassin, and may be enjoined, under § 21(e) of the Exchange Act, as aiders and abetters.  SEC v. Barraco, supra, 438 F.2d 97.

SEC v. RESCH-CASSIN & CO., supra, 362 F. Supp. At 981 (underscore and *italics* added).

## V.   PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS AND HAS SUFFERED I RREPARABLE HARM.

The irreparable harm prong of the Winter test requires that a plaintiff "demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief."  Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988).  "Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  Spark Indus., LLC v. Kretek Int'l, Inc., No. CV 14-5726-GW(ASX), 2014 WL 12600262, at *3 (C.D. Cal. July 29, 2014) (*citations omitted*); *see also* 11A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (3d ed. rev. 2014) ("Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.").

The undisputed evidence is that Robinhood unilaterally halted all "buy" features on its app, for all of its retail customers, and that it will continue to do so unpredictably so that artificial restrictions and suspensions of purchasing (or sales) of stocks, will continue with little to no notice to its customers.  Regardless of its motives, the evidence is that Robinhood will continue unabated unless otherwise ordered.

" 'The essential objective of securities legislation is to protect those who do not know market conditions from the overreachings of those who do.  Such protection will mean little if it stops short of the point of ultimate consequence, namely, the price charged for the securities.'  Charles Hughes & Co. v. SEC, 139 F.2d 434, 437 (2d Cir. 1943), *cert. denied*, 321 U.S.  786, 64 S. Ct. 781, 88 L. Ed. 1077 (1943)."  SEC v. RESCH-CASSIN & CO., supra, 362 F. Supp. at 978-979.

Here, Plaintiff, and those similarly situated are irreparably harmed by the interference

with the natural order of supply and demand and compromise our fair and orderly stock markets since Robinhood interposed a suspension to one-side of trading on selective stocks without any notice, and unpredictably. Other retail customers at other brokerage firms at the same time are and were permitted to purchase *or* sell the same stocks; but Plaintiff and others like him on Robinhood were and will continue to be locked out, and put at a disadvantageous position comparatively without any alternatives.

The irreparable harm is evidenced by unilateral suspension and ravaging of the markets done by Robinhood's disruption to the natural order of supply and demand, since it feels it can turn off its "buy" features "proactively."  As such, a TRO is not only imperative to stop the cause of ongoing substantial harm, it would also help stop the undermining of this Court's ability to order an adequate and effective remedy if Plaintiff prevails on its claims. See, e.g., <u>FTC v. Swedish Match N. Am., Inc.</u>, 131 F. Supp. 2d 151, 173 (D.D.C. 2000) ("absence of an injunction will also make it impossible to accomplish full relief").

Under the glare of 15 USC § 78i (i), Robinhood also interfered with the SEC and other government agency's regulatory powers over the free open markets at a time of massive market volatility.  Despite the absence of governmental orders of suspension of trading in GME, AMC, or BB or other stocks at issue,  Robinhood unpredictably and unilaterally suspended stock purchases.  Importantly, Robinhood's suspension of the "buy" feature/button, creates a *cloud of suspicion about conflicts of interest* between it and one of its main investors (Citadel Securities), leaving its millions of retail customers in the dark.

As of now, Robinhood has still not restored full functionality and continues to and does unpredictably disrupt the purchasing (and sales) ability of stocks and derivatives. Plaintiff and those similarly situated are unable to normally transact on the Robinhood app as they did prior to Robinhood's suspension of the "buy" features/buttons, which also require Plaintiff's computers or handheld devices to process unwanted or unauthorized codes and data from Robinhood's computers in violation of the Computer Fraud and Abuse Act.

Accordingly the first prong is satisfied.

**A. THE FIRST CAUSE OF ACTION FOR VIOLATION OF MANIPULATION STANDARDS SUPPORTS A TRO AND PRELIMINARY INJUNCTION.**

The Legislature created a private right of action under 15 USC § 78i (f). A violation of subdivisions (a) to (c) thereof, imposes liability. There is a solid proscription against collusive or improper transactions such as wash sales or matching sales, so that stocks are not maneuvered artificially. Subdivision (a) states that, "[i]t shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange—…[¶]

***

(2) To effect, alone or with 1 or more other persons, a series of transactions in any security registered on a national securities exchange, any security not so registered, or in connection with any security-based swap or security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

***

(6) To effect either alone or with one or more other persons any series of transactions for the purchase and/or sale of any security other than a government security for the purpose of pegging, fixing, or stabilizing the price of such security in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

As evidenced, Robinhood "effected" a series of transactions that created an actual or apparent active trading in GME, AMC, BB, and other securities, causing the price of shares to be depressed. The suspension was purposely done to influence the purchase or sale of those securities. It is axiomatic that entirely halting one-side of a retail customer's ability to transact, by suspending purchasing, is disruptive of the natural order of supply and demand of the markets that caused and causes a disadvantage to all of the markets and particularly to Plaintiff, and those similarly situated. SEC v. Masri, 523 F. Supp. 2d 361, 371 (S.D.N.Y., 2007) ["the purpose of securities law to 'prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded. (citation omitted)'"].

In doing what it did and continuing to do so, Robinhood was and is acting in contravention to rules and regulations of the Commission that are necessary and

appropriate to the public interest and protection of investors such as Plaintiffs.  After Robinhood suspended purchases, the price of the various stocks distorted and caused unnatural pricing.  Such acts are contrary to 15 USC § 78i (a)(2) and (6) and (i).

For example, on the close of market trading of January 27, 2021, AMC shares traded at $19.88 per share.  **Kar Decl., ¶4**; **Exhibit 1**, intraday trading chart for AMC shares 1/27/2021.  On the morning on January 28, 2021, Robinhood imposed purchasing restrictions and suspended the "buy" feature on its app, which artificially drove the price of AMC shares down given the absence of purchasing.  **Kar Decl., ¶4**.  At 9:30 am on January 28, 2021, AMC shares were priced at $12.03; by 11:30 am that day, AMC shares traded down even further to $7.51.  By close of trading on January 28, 2021, AMC shares rested at $8.68.  **Kar Decl., ¶4**.

Subdivision (i) makes it clear that Robinhood's imposition of  restrictions during volatility in the marketplace, i.e. suspending one-side of transactions on its platform to its more than 10,000,000 customers, is unlawful.  Its suspension of purchasing was contrary to the rule and regulations requiring a fair and orderly market, uncompromised by artificial mechanisms that influence buyers or sellers in that marketplace.  Meaning, Robinhood acted unlawfully under 15 USC § 78i (i) by imposing a suspension of only one-side of its transaction-ability for its customers, which was calculated to disorder and compromise the fairness of our securities markets.

Robinhood, therefore, cannot hide behind assertions that its capital or liquidity requirements prompted it to, unprecedently, suspend purchasing of selective stocks.  SEC v. RESCH-CASSIN & CO., supra, 362 F. Supp. at 978.  Its decision to suspend only one-side of transactions was known to and should have been recognized as illegal market manipulation.  Id. at 981.  Accordingly, Plaintiff and those similarly situated, are likely prevail on the merits on this cause of action.

### B. THE SECOND CAUSE OF ACTION FOR CFAA, ALSO MERITS A TRO/OSC RE: PRELIMINARY INJUNCTION.

"Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."  18 USC § 1030 (g).  Robinhood lured millions of retail

customers to download its app with the promise of a fair and orderly market, and its adequate capitalization.  See, e.g, id. at 978.  Robinhood app always allowed trading of stocks and derivatives without independent suspension of the "buy" or "sell" features until January 28, 2021 when it abruptly stopped allowing purchasing of selective stocks.

In order to do that, Robinhood transmitted a program, code, or command to Plaintiff's computer and smartphone device (and to those similarly situated) that disabled the "buy" feature/button on its app, which denied services deliberately.  Plaintiff and those similarly situated had "protected computers" did not receive advance warning of that practice and did not authorize Robinhood's actions.  The Computer Fraud and Abuse Act ("CFAA") criminalizes acts knowingly causing damage to a protected computer without authorization. Estes Forwarding Worldwide LLC. v. Cuellar, 239 F. Supp. 3d 918, 923 ["The phrase 'exceeds authorized access' means 'to access a computer with authorization and to use such access to obtain or alter information in that computer that the accesser is not entitled to obtain or alter."]

Whoever—

(5) [¶] (A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

(B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

(C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.

18 USC § 1030 (a).

The CFAA applies to an unauthorized denial or interruption of services.  For instance, a Distributed Denial of Service attack, or DDOS, computer attack, was found to violate the CFAA.  United States v. Raisley, 466 Fed. Appx. 125 (3rd Cir. 2012) (cert. denied, 568 U.S. 862, 133 S. Ct. 216, 184 L. Ed. 2d 111 (2012)).  "A DDOS attack uses multiple computers simultaneously to request information from a website. If done on a large enough scale, the requests overwhelm the website, take the victim server off line, and render the site inaccessible."  Id. at 127.

On January 28, 2021, Robinhood transmitted code or programs that rendered

purchase services inaccessible on its app, and such that the securities markets experienced depressed prices in connection with the securities at issue here. There was no precedent for Robinhood's actions and it has triggered a cloud of suspicion that it had significant conflicts of interests due to its unnatural interruption to demand and supply of the markets.

Indeed, Robinhood had no authorization to change Plaintiff's computer with new or different codes that suspended purchasing functions, because it exceeded any permissions it had previously secured from Plaintiff or those similarly situated.  United States v. John, 597 F.3d 263, 272 (5th Cir. 2010) [" 'exceeds authorized access' may include exceeding the purposes for which access is 'authorized.'  Access to a computer and data that can be obtained from that access may be exceeded if the purposes for which access has been given are exceeded."]

Such prolific conduct resulted in more than $5,000 in damage to Plaintiff and those similarly situated since they were unable to have full access to a natural and orderly fair market.  "'Loss' includes the direct costs of responding to the violation in the first portion of the definition, and consequential damages resulting from interruption of service in the second."  Brown Jordan Int'l, Inc. v. Carmicle, 846 F.3d 1167, 1174 (11th Cir. 2017).  Not only was Plaintiff unable to purchase shares but the market volatility and suspension of purchasing impacted the pricing of shares artificially, costing Plaintiff and those similarly situated, to experience depressed prices on existing holdings and positions.

By interrupting services as it did, Robinhood violated the CFAA, causing Plaintiff's damages and injury.  As a result, there is a substantial likelihood of prevailing on the merits of this claim as well.  Accordingly, the Court has good and sufficient cause to grant the TRO or preliminary injunction.

### C.  UNLAWFUL AND UNFAIR BUSINESS PRACTICES LAW ALLOWS FOR INJUNCTIVE RELIEF.

Robinhood's Customer Agreement, revised June 22, 2020, provides in ¶ 37, that: "K. Governing Law…[¶] This Agreement and all transactions made in My Account shall be governed by the laws of the State of California (regardless of the choice of law rules thereof), except to the extent governed by the federal securities laws, FINRA Rules, and the regulations, customs and usage of the exchanges or market (and its clearing house) on

1   which transactions are executed."  Attached hereto as **Exhibit 4** is a true and correct copy

2   of an excerpt of the Robinhood Customer Agreement, revised June 22, 2020, see ¶ 37 (k).

3          California's Unfair and Unlawful Business Practices Act, Business & Professions

4   Code § 17200, governs and proscribes Robinhood's interruption or suspension of

5   purchasing, or even sales, of stocks on its app in the way it has done.  As explained above,

6   Defendants' actions violated securities laws and laws protecting misuse of Plaintiff and the

7   proposed class member's computers or devices.  Business and Professions Code section

8   17203 specifically empowers the Court to issue orders "as may be necessary to prevent the

9   use or employment by any person of any practice which constitutes unfair competition."

10          Once the trial court invokes its equitable jurisdiction, it is within the court's broad

11   discretion to determine the scope or type of relief that should be granted.  <u>People ex rel.</u>

12   <u>Mosk v. Natal Research Co. of Cal.</u>, 201 Cal.App.2d 765, 775, 779 (Cal.Ct.App. 1962).

13   Such relief may be as "varied and diversified as the means that have been employed by the

14   Defendant to produce the grievance complained of." <u>Wickersham v. Crittenden</u>, 93 Cal. 17,

    32 (Cal.Sup.Ct. 1892); <u>Roman v. Ries</u>, 259 Cal.App.2d 65, 70 (Cal.Ct.App. 1962).

15          Where a legislative body has enacted a statutory provision proscribing a certain

16   activity, it has already determined that such activity is contrary to the public interest. Further,

17   where the legislative body has specifically authorized injunctive relief against the violation of

18   such a law, it has already determined (1) that significant public harm will result from the

19   proscribed activity, and (2) that injunctive relief may be the most appropriate way to protect

20   against that harm.

21   <u>IT Corp. v. County of Imperial</u>, 35 Cal.3d 63, 70 (Cal.Sup.Ct. 1983)

22          As recounted above, Defendants employed a selective interruption to the natural

23   order of supply and demand on the securities markets which created further volatility in the

24   pricing of those stocks and derivatives.  Defendants' actions also conspicuously took place

    while apparent conflicts of interest existed with a related entity, Citadel Securities.

25   Robinhood's CEO publicly admitted that his actions were "proactive" and there was no court

26   or government agency order, or other restrictions compelling its artificial interruption of the

27   markets.

28          An unlawful business act or practice includes any business activity that is "forbidden

by law, be it civil or criminal, federal, state or municipal, statutory, regulatory, or court-made [law]."  Saunders v. Superior Court (1994) 27 Cal. App.4th 832, 838-839.  In other words, Section 17200 "borrows" violations of other laws and makes them actionable as unlawful business practices.  State Farm Fire & Casualty Co. v. Superior Court (1996) 45 Cal.App.4th 1093, 1102.  Thus, any violations of 15 USC § 78i or 18 USC 1030 (a), above, support the temporary restraining order or preliminary injunction requested.

Robinhood artificially restricted the supply and demand of stocks and in contravention of law and rules of a fair and orderly market.  This Court has good cause to order a Temporary Restraining Order requested as a result.

## VI.   PLAINTIFF, THE PROPOSED CLASS, AND THE INVESTING PUBLIC SUFFER IRREPARABLE HARM AS A RESULT OF THE MARKET MANIPULATION.

The imposition of restrictions to one or the other side of a transaction, buy or sell, is an artificial limit on sales or purchases imposed by Robinhood, that disrupts a fair and orderly maintenance of the markets and unfairly depressed pricing of shares affected. Absent this Court's preliminary order restoring the full functionality of Robinhood's trading platform, and command that it discontinue creating a lopsided market, Plaintiff and the proposed class members, and the general public, suffer irreparable harm and damage. Such conduct constitutes an unwanted, artificial and unpredictable market manipulation.  As expressed above, the Court has ample reasons to find irreparable harm warranting a restraining order or preliminary injunction in this case.

## VII.   BALANCING OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR GRANTING RELIEF.

In balancing the equities, "[a] court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Arc of Cal., supra, 757 F.3d at 991 (quoting Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 542 (1987)).  But the rule of law holds that Defendants "'cannot suffer harm from an injunction that merely ends an unlawful practice.'"  Ms. L. v. ICE, 310 F. Supp. 3d 1133, 1147 (S.D.Cal. 2018) (quoting Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013)).

Plaintiff seeks to restore the normal operations of Robinhood's transaction/trading platform so that it cannot any longer engage in selective halting of securities without a prior

order of this Court or a government agency.  The imbalance created by allowing Robinhood to act unilaterally and unpredictably, in ways a market maker or regulator typically acts, undermines the Legislative intent of requiring a fair and orderly market and interferes with governmental functions.  15 USC § 78i (i).

Indeed, the public is much  better served by disallowing interested stock brokerage firms (like Robinhood) from acting like a market maker or regulator, and "bottlenecking" sales or purchases it allows to be processed unpredictably to the disadvantage of its retail customers such as Plaintiff and the proposed class.

Moreover, "it is obvious that compliance with the law is in the public interest."  N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dep't of Educ., 600 F.3d 1104, 1113 (9th Cir. 2010); see also Small v. Avanti Health Sys., LLC, 661 F.3d 1180, 1197 (9th Cir. 2011) (The "public interest favors applying federal law correctly.").  The equities here favor Plaintiff and those similarly situated.  Defendants interposed an abrupt and unannounced halt on all purchases of selective stocks and derivatives while it serviced an apparent conflict of interest with Citadel Securities, to the detriment of its millions of retail customers. The practice of halting purchases has not ended and Robinhood proposes it may do so unpredictably and without prior notice to its affected retail customers, who are at risk of Robinhood's artificial and wrongful actions to prevent the purchase of shares or derivatives.

As long as "it appears fairly clear that the plaintiff will prevail on the merits, a trial court might legitimately decide that an injunction should issue even though the plaintiff is unable to prevail in a balancing of the probable harms."  IT Corp. v. County of Imperial, supra, 35 Cal.3d at 72-73.   But it is also insufficient for Robinhood to try and attempt to excuse its market manipulative conduct by "proactively" seeking to curb alleged illiquidity or risks from its own clearinghouse obligations.  If Robinhood cannot satisfy the obligations under law, it should not be allowed to resort to unmaterialized claims of illiquidity or risks from its own clearinghouse obligations.

Accordingly, the equities and public interest in a stable market, balance heavily in favor of an restraining order against Defendants as requested.

**VIII.   THE COURT SHOULD SET A NOMINAL BOND OF $1,000 AT MOST SINCE ROBINHOOD IS ONLY REQUIRED TO ADHERE TO NORMAL OPERATING STANDARDS.**

Any bond requirement ordered should be nominal given the absence of any harm or damage to the Defendants.  Defendants are merely required to comply with their ordinary and regularly business operations of allowing sales and purchases without restrictions. Importantly, nothing prevents Robinhood from suspending trading uniformly (so that purchasing and sales are halted simultaneously) or entirely suspending its business until it finds a way to operate without market manipulative conduct.

As such, the Court can set any bond requirement at $1,000, if any is required at all.

## IX.    CONCLUSION.

WHEREFORE, this Court is respectfully requested to grant this *ex parte* application for the requested TRO, and set a briefing and hearing schedule for the OSC re: preliminary injunction. Univ. of Texas v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981) [while a plaintiff has the burden of demonstrating likelihood of success, she is not required to prove her case in full at this stage but only such portions that enable them to obtain the injunctive relief they seek].

Dated: February 2, 2021

Respectfully Submitted,
**LAW OFFICE OF JOSEPH M. KAR, PC**


By: ___/Joseph M. Kar/_____
                 Joseph M. Kar

-and –

Gerald L. Kroll
KROLL LAW

Attorneys for Plaintiff, **LEVI COBOS**, an individual, and on behalf of those similarly situated,

1

**DECLARATION OF LEVI COBOS IN SUPPORT**

2

I, Levi Cobos, say,

3
4
5
6
7
8
9

1. I am the plaintiff in this proposed class action and make this declaration upon my personal knowledge of the facts and information contained herein, unless otherwise stated under information and belief.  If called upon to testify I could and would competently do so.  This declaration is offered against Defendants ROBINHOOD FINANCIAL LLC;  ROBINHOOD SECURITIES, LLC; and ROBINHOOD MARKETS, INC., (collectively hereinafter "Robinhood") in respect to an *ex parte* application for a temporary restraining order and/or OSC re: preliminary injunction, or for shortening time thereon.

10
11
12
13
14
15
16

2. I am 27 years old and graduated Loyal Marymount University with a Bachelors of Arts degree in Business Marketing.  I have been interested in learning more about the "stock market" and decided to open an account with "Robinhood" after downloading its "app."  A big draw for me was that Robinhood promoted itself as a new kind of stock brokerage firm, that was aimed, like its name suggests, to help the small investor, and young investors, such as myself and my friends, and others like me.

17
18
19
20

3. Robinhood's website and app has that theme built into it and incorporates "tutorial" or information pages about how it is there to help the micro-investor.  A second draw for me was that the app was free to download and free to purchase or sell stocks, to be the best of my knowledge there were no transaction fees.

21
22

4. After downloading the app about two months ago and signing up, I deposited $10,000 with Robinhood so that I can purchase or sell stocks and securities.

23
24

5. By close of trading on January 27, 2021, I held 250 shares of AMC Theatres (NYSE: AMC), and an open call option for Blackberry (NYSE: BB) with a strike price of $24, with an expiration date of January 29, 2021.

25
26
27
28

6. The following day on January 28, 2021, I attempted to make a purchase of shares in AMC by depressing the "buy" feature or button associated with that stock on Robinhood, but it was shaded gray so that I was prevented from placing an order for purchase of that stock.  I took a screen-shot of the Robinhood app user

interface at that time.  Attached hereto as **Exhibit 1** is a true and correct copy of that screen shot showing Robinhood's denial of access to trading of AMC shares on January 28, 2021.

7.  I attempted to access the "buy" feature or button for shares in BB the same way, but, again, I was denied access and prevented from placing an order for purchase on that stock/option as well.  I took a screen-shot of the Robinhood app user interface at that time.  Attached hereto as **Exhibit 2** is a true and correct copy of that screen shot showing Robinhood's denial of access to trading of BB shares/options on January 28, 2021.

8.  While the "buy" buttons on the Robinhood app were shaded gray, at the same time sell features or buttons were available on AMC and BB, which I understood to mean that the "sell" buttons were not deactivated.

9.  I was unnerved and did not know what to do.  I did not have any prior notice of any kind that the "buy" feature on any stock could just be disabled without  notice.

10. Because the Robinhood app eliminated the option to purchase, I was directly exposed to loss and did suffer the loss of my BB call option, that expired; and I was also unable to purchase any shares of AMC to add to my existing position.

11. As a new investor, I try to keep in touch with various online media sources about current events.  On January 28, 2021, I came to learn that the Robinhood app had shut down purchasing of more than just AMC and BB.  Robinhood was reported by various media outlets, that I saw, to have an early investor (Citadel Securities) in its business that held a large "short-sale" position on Gamestop (NYSE: GME) and, upon information and belief, AMC and BB, and other stocks.  I did not ever know and was never notified (before this action was filed) that one of Robinhood's early investors in its business, also had separate long or short positions in any of the stocks or options I owned or otherwise that Robinhood or the Robinhood app halted purchasing on such stocks on January 28, 2021, that I owned while its early investor was long or short positions in any given stocks, ("Conflict of Interest Lock-Out").  At this stage, there is no absolute way of actually knowing whether Robinhood's decision to halt purchasing of any stocks was not

tainted by the Conflict of Interest Lock-Out, but Robinhood certainly did not disclose anything of its conflicts of interest to protect its customer.

12. I also saw reports from various media outlets that Robinhood was believed to be the only stock deal/trader/brokerage firm that entirely halted purchasing of shares in stocks while still allowing selling of the same shares. I did not ever know and was never notified (before this action was filed) that Robinhood or the Robinhood app could halt purchasing of any stocks without prior notice of any kind for an indefinite period of time, ("Unsymmetrical Trading"). It seems very obvious to me that a stock brokerage firm should not be able to shut down or "turn off" the "buy" or "sell" feature or button on any of its customers, let alone 10,000,000+ customers. Allowing a brokerage to do something like that unpredictably, especially without government action and unannounced, causing complete volatility and confusion in the marketplace amongst all of its customers, which affects the entire marketplace.

13. While I am not an expert in the stock market or economics of any kind (and I do not pretend to be), I do understand the simple principle of volatility when a marketplace all of a sudden and unpredictably cuts-off only one side of the transaction, and having serious conflicts of interest at the same time.

14. Had I known or was notified that Robinhood or the Robinhood app could or would be able to affect the value of my shares because of the Conflict of Interest Lock-Out or Unsymmetrical Trading, I would not have downloaded the app, and deposited money with them or done business with them.

15. As a result, I respectfully ask this Court for myself, and those similarly situated as me, to order Robinhood to immediately restore full functionality (buy and sell functions) on its trading platform so that all stocks and options (and derivatives) are unrestricted unless otherwise ordered by a government agency or this Court. I also respectfully request that this Court further set for hearing and a briefing schedule on an order to show cause why a preliminary injunction should not be granted.

1        I declare that the foregoing is true and correct under the laws for penalty of perjury in

2  the United States.  Executed this 2nd day of February, 2021 at Los Angeles, California.

Levi Cobos

Levi Cobos

## <u>DECLARATION OF JOSEPH M. KAR, ESQ. IN SUPPORT</u>

I, Joseph Kar, say,

1. I am an attorney licensed before all the courts in the state of California, the United States District Court Central District, Ninth Circuit Court of Appeals, and United States Supreme Court.  I make this declaration in support the ex part application of Plaintiff, LEVI COBOS, seeking a temporary restraining order requiring Defendants to restore functionality to the purchasing and selling features on its app and website without further restrictions unless otherwise ordered by a government agency or this Court and for an OSC re: preliminary injunction.

2. **EX PARTE NOTICE**: On February 2, 2021, before 10:30 am (Pacific time), I contacted Kevin Orsini, Esq. at Cravath, Swaine & Moore, LLP via phone and left a message, and email, and I sent him via email a copy of the moving papers.   I advised him that Plaintiff, LEVI COBOS, would be appearing *ex parte* before this Court for a temporary restraining order and for an OSC re: preliminary injunction against Defendants ROBINHOOD FINANCIAL LLC; ROBINHOOD SECURITIES, LLC; and ROBINHOOD MARKETS, INC. (collectively hereinafter, "Robinhood.")  I advised Mr. Orsini of the nature of the relief sought being an temporary restraining order to restore full functionality of the Robinhood app unrestricted unless otherwise ordered by this Court or a government agency, and for an OSC re: preliminary injunction.  I advised Mr. Orsini that I filed the *ex parte* application on February 2, 2021, for consideration by Honorable Christina A. Snyder in Courtroom 8D of the First Street Courthouse, located at 350 W. First Street, Los Angeles, CA 90012.

3. On January 29, 2021, Vladimir Tenev, the CEO of Robinhood, appeared on CNN and was interviewed by Chris Cuomo about the halting of purchasing of stocks and derivatives that his company imposed on its customers.  Mr. Tenev confirmed that Robinhood has approximately 13,000,000 users.  He also stated that the halt was done "proactively," and that his company was halting purchasing only because of "risk" to his company and the customers of Robinhood.  Mr. Tenev also acknowledged that "Citadel" was an early investor in the Robinhood

business, and that Citadel had a "short" position in Gamestop, one of the stocks that Robinhood halted purchasing on.  The link to the full interview is: https://www.cnn.com/videos/business/2021/01/29/robinhood-ceo-vlad-tenev-gamestop-stock-cpt-vpx.cnn.  I obtained a copy of the link directly from the CNN website at https://www.cnn.com, which I also saw in person when it was first aired, which was the same interview in the link provided.

4.  The historical pricing for shares of stock or derivatives listed on the securities markets, such as the New York Stock and NASDAQ/AMEX exchanges, are publicly reported.  On the close of market trading on January 27, 2021 at about 4pm, AMC shares traded at $19.88 per share.  Attached hereto as **Exhibit 3** is a true and correct copy of the intraday trading chart for AMC shares on January 27, 2021.  The following morning, on January 28, 2021, Robinhood imposed purchasing restrictions and suspended the "buy" feature on its app, which artificially drove the price of AMC shares down given the absence of purchasing.  By 9:30 am on January 28, 2021, AMC shares were priced at $12.03; by 11:30 am that day, AMC shares traded down even further to $7.51.  By close of trading on January 28, 2021, AMC shares rested at $8.68.

5.  Robinhood does not appear to be discontinuing its practice of disabling or preventing its customers from purchasing securities on its app, based on my most recent review of the Robinhood app and news/media reporting that Robinhood is continuing to halt such purchases.  Absent this Court's order restraining Robinhood and its improper or unlawful conduct, Plaintiff and those similarly situated and the general public, will continue to be harmed and deprived a fair and orderly securities markets free from artificial disruptions to supply and demand.

6.  Attached hereto as **Exhibit 4** is a true and correct copy of the excerpt of the Robinhood Customer Agreement (revised June 22, 2020) containing ¶ 37 k.

7.  Therefore, I respectfully request that this Court grant the instant *ex parte* application and enter a temporary restraining order to restore the full functionality

1      of the Robinhood app without restrictions, and to set a briefing and hearing

2          schedule for an OSC re: preliminary injunction.

3          I declare that the foregoing is true and correct under the laws for penalty of perjury in

4   the United States.  Executed this 2nd day of February, 2021 at Los Angeles, California.

5                              /Joseph M. Kar/

6                              Joseph M. Kar