1  Antony L. Ryan (*pro hac vice* pending)
       aryan@cravath.com
2  Kevin J. Orsini (*pro hac vice* pending)
       korsini@cravath.com
3  CRAVATH, SWAINE & MOORE LLP
   825 Eighth Avenue
4  New York, New York 10019-7475
   Telephone:  (212) 474-1000
5  Facsimile:  (212) 474-3700

6  Naeun Rim (State Bar No. 263558)
       nrim@birdmarella.com
7  Grace W. Kang (State Bar No. 271260)
       gkang@birdmarella.com
8  BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
   DROOKS, LINCENBERG & RHOW, P.C.
9  1875 Century Park East, 23rd Floor
   Los Angeles, California 90067-2561
10 Telephone:  (310) 201-2100
   Facsimile:  (310) 201-2110
11
12 *Attorneys for Defendants Robinhood Financial LLC;*
   *Robinhood Securities, LLC; and Robinhood Markets, Inc.*

13              **UNITED STATES DISTRICT COURT**

14              **CENTRAL DISTRICT OF CALIFORNIA**

15

| | |
|---|---|
| LEVI COBOS, an individual and those similarly situated, | Case No. 21-cv-00843-VAP-MRW |
| | [Related Cases 2:21-cv-00835-VAP (MRWx); 2:21-cv-00837-VAP (MRWx)] |
| Plaintiff(s), | |
| v. | **ROBINHOOD FINANCIAL LLC, ROBINHOOD SECURITIES, LLC AND ROBINHOOD MARKETS, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER SHOWING CAUSE FOR A PRELIMINARY INJUNCTION** |
| ROBINHOOD FINANCIAL LLC, a Delaware limited liability company; ROBINHOOD SECURITIES, LLC, a Delaware limited liability company; and ROBINHOOD MARKETS, INC., a Delaware corporation, | |
| Defendants. | |
| | Judge:  Hon. Virginia A. Phillips |
| | Courtroom:  8A |
| | Hearing Date:  February 10, 2021 |
| | Hearing Time:  10:00 A.M. |

28

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................... 3

PRELIMINARY STATEMENT ................................................................ 6

FACTUAL BACKGROUND ..................................................................... 8

I.    Robinhood, the Customer Agreement and Trading Mechanics. ..................... 8

II.   Robinhood's Response to Unprecedented Trading Volatility. ..................... 10

LEGAL STANDARD ............................................................................ 13

ARGUMENT ..................................................................................... 14

I.    PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS. ............... 14

    A.    Plaintiff's Securities Exchange Act Claim Fails............................... 14

        i.    Plaintiff Does Not Have a Viable Private Right of Action. .................................................................... 14

        ii.   Plaintiff Cannot Prove Section 9(a) Market Manipulation. ...... 15

            (1)    Plaintiff Fails to Allege Manipulative Conduct ............. 15

            (2)    Plaintiff Cannot Prove Scienter. ...................................... 17

    B.    Plaintiff's Computer Fraud and Abuse Act Claim Fails. .................... 18

    C.    Plaintiff's Unfair Competition Law Claim Fails. ............................. 20

        i.    Plaintiff Lacks Standing to Pursue His UCL Claim. ............... 20

        ii.   Plaintiff's UCL Claim Cannot Succeed on the Merits. ........... 21

        iii.   Robinhood's Lawful Acts Cannot Violate the UCL. .............. 23

    D.    Plaintiff's Negligence Claim Fails. ............................................. 24

II.   PLAINTIFF CANNOT CLEARLY SHOW IRREPARABLE HARM. ...... 25

    A.    Plaintiff Has Not Demonstrated Past, Present or Imminent Harm. ................................................................................ 25

    B.    Any Alleged Harm Can Be Remedied with Damages. ...................... 27

III.  THE BALANCE OF THE EQUITIES FAVORS DEFENDANTS. ............ 27

IV.  A TEMPORARY RESTRAINING ORDER IS NOT IN THE PUBLIC INTEREST. ........................................................................ 29

V.   PLAINTIFF WOULD HAVE TO POST A BOND SUFFICIENT TO COVER ALL POTENTIAL HARM TO ROBINHOOD. ........................... 30

CONCLUSION ................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531 (1987) ....................................27

*Bejou v. Bank of Am.*, No. CV F 13-0125 LJO SMS,
  2013 WL 1759126 (E.D. Cal. Apr. 24, 2013) ....................................................21

*Bofi Fed. Bank v. Erhart*, 2016 WL 4680291 (S.D. Cal. Sept. 7, 2016)................27

*Byars v. SCME Mortg. Bankers, Inc.*, 109 Cal. App. 4th 1134 (2003) ..................23

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) ..........................................................................25

*Connolly v. Havens*, 763 F. Supp. 6 (S.D.N.Y. 1991)............................................17

*Crane Co. v. Westinghouse Air Brake Co.*,
  419 F.2d 787 (2d Cir. 1969) ............................................................................16

*de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293 (2d Cir. 2002) ...........24, 25

*Dekalb Cty. Pension Fund v. Transocean Ltd.*,
  817 F.3d 393 (2d Cir. 2016) ...........................................................................18

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) .........................................14, 18

*Gurfein v. Ameritrade, Inc.*, 312 F. App'x 410 (2d Cir. 2009) .............................22

*Herb Reed Enterprises, LLC v. Florida Ent. Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013) ........................................................................26

*In the Matter of Scottrade, Inc.*, Exchange Act Release No. 58012,
  93 S.E.C. Docket 1550, 2008 WL 2510611 (June 24, 2008)......................22, 25

*In re Excel Innovations, Inc.*, 502 F.3d 1086 (9th Cir. 2007) ...............................27

*In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148 (C.D. Cal. 2007)................18

*Jewelcor Inc. v. Pearlman*, 397 F. Supp. 221 (S.D.N.Y. 1975)............................17

*John Labatt Ltd. v. Onex Corp.*, 890 F. Supp. 235 (S.D.N.Y. 1995) ....................29

*Jolley v. Welch*, 904 F.2d 988 (5th Cir. 1990).....................................................17

*Lanovaz v. Twinings N. Am., Inc.*, 726 F. App'x 590 (9th Cir. 2018)....................21

*Lopez v. Brewer*, 680 F.3d 1068 (9th Cir. 2012) .............................................13, 25

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
  634 F.2d 1197 (9th Cir. 1980) ........................................................................27

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...............................................21

*LVRC Holdings LLC v. Brekka*, 581 F.3d 1127 (9th Cir. 2009) ............................20

*Mackell v. Wells Fargo Home Mortg.*, No. 16-CV-04202-BLF,
2017 WL 373077 (N.D. Cal. Jan. 26, 2017)...........................................................24

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d
873 (9th Cir. 2009) ....................................................................................................14

*Martin v. Int'l Olympic Comm.*, 740 F.2d 670 (9th Cir. 1984) .............................13

*Maxlite, Inc. v. ATG Elecs., Inc.*, 2020 WL 6260007
(C.D. Cal. July 13, 2020)..........................................................................................17

*McElroy v. Majchrzak*, No. EDCV 20-2228 (JGB), 2020 WL 7248373
(C.D. Cal. Oct. 27, 2020)..........................................................................................17

*Moroccanoil, Inc. v. Zotos Int'l, Inc.*, 230 F. Supp. 3d 1161 (C.D. Cal.
2017) ............................................................................................................................30

*N. Cheyenne Tribe v. Norton*, 503 F.3d 836 (9th Cir. 2007)..................................27

*Nuvasive, Inc. v. Cadwell Indus., Inc.*, No. 12CV3065 JLS (JMA),
2013 WL 12096625 (S.D. Cal. Nov. 4, 2013)........................................................23

*Onel v. Top Ships, Inc.*, 806 F. App'x 64 (2d Cir. 2020) .......................................15

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636
F.3d 1150 (9th Cir. 2011)..........................................................................................13

*Peredia v. HR Mobile Servs., Inc.*, 25 Cal. App. 5th 680 (2018) ...........................24

*Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295
(6th Cir. 2011) ............................................................................................................19

*Richardson v. Shearson/Am. Express Co.*, 573 F. Supp. 133
(S.D.N.Y. 1983)..........................................................................................................15

*SEC v. Malenfant*, 784 F. Supp. 141 (S.D.N.Y. 1992)............................................16

*SEC v. Resch-Cassin & Co.*, 362 F. Supp. 964 (S.D.N.Y. 1973)...........................16

*Sheen v. Wells Fargo Bank, N.A.*, 38 Cal. App. 5th 346 (2019) ............................24

*Sierra Military Health Servs., Inc. v. United States*,
58 Fed. Cl. 573 (2003)...............................................................................................27

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th
Cir. 2001)....................................................................................................................28

*Thurmond v. Compaq Comp. Corp.*, 171 F. Supp. 2d 667 (E.D. Tex.
2001) ............................................................................................................................19

*United States v. Raisley*, 466 F. App'x 125 (3d Cir. 2012) ..................................... 19

*Video Gaming Techs., Inc. v. Bureau of Gambling Control*, 356 F.
App'x 89 (9th Cir. 2009) ................................................................ 29

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ......................... 7, 13, 29

*Wright v. Gen. Motors Acceptance Corp.*, 545 F. App'x 686 (9th Cir.
2013) ........................................................................................... 20

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ....................... 27

**Statutes & Rules**

15 U.S.C. § 78i .......................................................................... *passim*

15 U.S.C. § 78u-4 ............................................................................. 18

18 U.S.C. § 1030 ........................................................................ 19, 21

Cal. Bus. & Prof. Code § 17200, *et seq.* ...................................... 20, 21

Fed. R. Civ. P. 9 ............................................................................... 18

Fed. R. Civ. P. 65 ............................................................................. 30

Financial Industry Regulatory Authority (FINRA) Rule 5310 ....................... 22, 25

**Other Authorities**

62 Fed. Reg. 520 (Jan. 3, 1997) ......................................................... 15

Joe Wallace, Amrith Ramkumar, Gunjan Banerji, *GameStop Mania
Hits a Wall of Tighter Trading Terms*, Wall St. J. (Feb. 2, 2021,
6:06 PM) ........................................................................................ 16

Quentin Webb, *Volatility Index Soars*, Wall St. J. (Jan. 27, 2021,
10:43 PM) ...................................................................................... 10

Securities and Exchange Comm'n, "Thinking About Investing in the
Latest Hot Stock?" (Jan. 30, 2021) ..................................... 6, 13, 23, 30

Telis Demos, *Why Did Robinhood Ground GameStop? Look at
Clearing*, Wall St. J. (Jan. 29, 2021, 7:33 PM) ..................................... 9

**PRELIMINARY STATEMENT**

Plaintiff Levi Cobos seeks an extraordinary temporary restraining order to force Defendants Robinhood Financial LLC ("RHF"), Robinhood Securities, LLC ("RHS") and Robinhood Markets, Inc. ("RHM") (collectively, "Robinhood") to accept customer trades for *any* stock without *any* limitation.  This demand flies in the face of the statement issued *after the events at issue* by the responsible government agency—the Securities and Exchange Commission ("SEC")—confirming in no uncertain terms that "broker-dealers may reserve the ability to reject or limit customer transactions.  This may be done for legal, compliance, or risk management reasons, and is typically discussed in the customer account agreement."[1]  In fact, Robinhood explicitly reserved that very right to reject or limit customer transactions in the agreement that Mr. Cobos accepted upon opening his account.  Granting Plaintiff's requested relief would strip RHS (the Robinhood clearing broker) of the ability to prudently manage risk and stay in compliance with applicable deposit requirements and regulations.

Robinhood—a broker-dealer that is democratizing finance for all—made the difficult decision to limit customer purchases for a select number of highly volatile securities from January 28 through February 4, 2021.  It did not make the decision as part of a nefarious conspiracy to benefit hedge funds.  To the contrary, it made that decision for entirely lawful reasons.  RHS is obligated to pay deposits to centralized clearinghouses to cover Robinhood customers' trades during a two-day settlement period in which the clearinghouse processes the transactions.  The purpose of the deposits—which RHS covers with its own capital—is to cover potential risk to the firm.  Clearinghouses require these deposits to protect the integrity and stability of the stock market as a whole.

---

[1] *See* Securities and Exchange Comm'n, "Thinking About Investing in the Latest Hot Stock?" (Jan. 30, 2021) ("SEC Statement"), https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert.

On the days at issue here, high trading volume and extreme volatility in certain stocks that had become "memes" on the internet resulted in an unprecedented deposit demand from a major clearinghouse.  As a result, to manage its risk, Robinhood exercised the discretion that it reserved in its Customer Agreement and, consistent with the SEC's guidance, decided to "limit customer transactions" in a small number of stocks.  This temporary measure allowed Robinhood to continue to support customer trading in as many securities as possible for Robinhood's entire customer base.  This decision was made by Robinhood acting on its own, and not at the behest, or for the benefit, of any third party.  As market conditions eased, Robinhood lifted *all* of the restrictions by February 5, 2021.

Plaintiff does not meet any of the four prongs of the *Winter* test necessary to obtain the requested injunction.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Robinhood's temporary restrictions were authorized by its Customer Agreements, and did not violate the Securities Exchange Act, the Computer Fraud and Abuse Act or California's Unfair Competition Law.  As such, Plaintiff is highly unlikely to succeed on the merits.  *See infra* Arg. Part I.

Plaintiff also cannot show that he has suffered or will suffer irreparable harm.  Robinhood never prevented its customers from selling securities they already held; the temporary restrictions—which have now been lifted entirely—related only to the purchase of certain *additional* securities.  It is entirely speculative whether Plaintiff would make or lose money on such purchases, and it is entirely speculative as to whether any restrictions will be implemented in the future and, if so, whether they will have any effect on Plaintiff.  Moreover, there are other broker-dealers available from which Plaintiff could have purchased the securities that were temporarily restricted, or can purchase any other securities in the future.  *See infra* Arg. Part II.

The balance of equities also clearly weighs in favor of Defendants (*see infra* Arg. Part III), and an injunction would not be in the public interest (*see infra* Arg. Part IV). The requested injunction would threaten to interfere with Robinhood's compliance with clearinghouse deposit requirements and SEC net capital regulations. Those requirements and regulations are designed to protect the stability of broker-dealers like Robinhood, safeguard its more than 13 million customers, and protect the stability of the stock market. An injunction overriding Robinhood's contractually permitted discretion to take steps required in its judgment to protect customers and meet regulatory requirements would risk irreparable harm to the Company, its customers and the investing public.

## **FACTUAL BACKGROUND**

### **I.     Robinhood, the Customer Agreement and Trading Mechanics.**

Robinhood is an industry-changing financial services company founded on the ethos of putting financial power into the hands of everybody—not just the few and wealthy. Started in 2013 by Vladimir Tenev and Baiju Bhatt, Robinhood's securities business currently comprises three entities: RHM, which wholly owns RHF, the customer-facing introducing broker, and RHS, the clearing broker. Robinhood provides intuitive, easy access to the financial markets by offering zero commission trades and a logical trading platform available on a computer or mobile device.

Customers sign up for Robinhood by accessing Robinhood's website or downloading the app. Prospective customers are required to review and agree to certain terms and conditions. One of the required agreements, the Customer Agreement, provides that Robinhood "may, in its discretion, prohibit or restrict the trading of securities, or the substitution of securities" in "any" of the customer's accounts. (Declaration of Brianna Bain ("Bain Decl.") Ex. D ¶ 16; *see also* Bain Decl. ¶¶ 12-13; Bain Decl. Ex. D ¶ 5.F.) The Customer Agreement further

provides that "Robinhood may at any time, at its sole discretion and without prior notice to [the customer]:  (i) prohibit or restrict [the customer's] access to the use of the App or the Website or related services and [the customer's] ability to trade, (ii) refuse to accept any of [the customer's] transactions, (iii) refuse to execute any of [the customer's] transactions, or (iv) terminate [the customer's] Account". (Bain Decl. Ex. D ¶ 16.)

Once an approved customer would like to place a trade, a number of steps occur behind the scenes.  The basic mechanics works as follows:  when a customer submits a "buy" or "sell" order for a security and RHF accepts the trade, RHF sends the order to RHS, which in turn sends the order to market makers to execute the trade.  (Declaration of Jim Swartwout ("Swartwout Decl.") ¶ 10.) Market makers send a record of the trade back to RHS, which works with a clearinghouse to process the trade.  (*Id.* ¶ 6.)  Clearinghouses are SEC-registered organizations that act as the central depository for securities.  (*Id.* ¶¶ 5-7.)  The main United States clearinghouse for equities is the National Securities Clearing Corporation ("NSCC"), part of a larger clearing organization called Depository Trust & Clearing Corporation ("DTCC").[2]  (*Id.* ¶ 6.)  It takes two days for the clearinghouse to transfer the stock to the buyer and funds to the seller.  (*Id.* ¶ 10.) This is known as the "settlement period" or the "T+2" settlement.  (*Id.*)

The two-day period between execution and settlement leaves open a risk that a participant in the transaction will be unable to meet its obligations.  A number of protections are in place to reduce this risk.  First, clearinghouses require clearing brokers, like RHS, to pay a deposit to clearinghouses to facilitate and clear trades until the trades are settled.  (*Id.* ¶ 11.)  The deposit amount is based on risk, which the clearinghouses calculate by looking to, among other things, a firm's

---

[2] Telis Demos, *Why Did Robinhood Ground GameStop? Look at Clearing*, Wall St. J. (Jan. 29, 2021, 7:33 PM), https://www.wsj.com/articles/how-clearing-demands-grounded-the-wallstreetbets-stocks-for-a-day-11611966092.

customer holdings and using a volatility multiplier.  (*Id.*)  To clear and settle customer transactions, clearing brokers, like RHS, must satisfy those deposit requirements, which can change throughout the course of a single day.  (*Id.* ¶ 12.)

Second, SEC regulations require broker-dealers like RHS and RHF to maintain a certain level of net capital to ensure the ability to promptly satisfy their liabilities at all times.  (*Id.* ¶ 14.)  Together, the clearinghouse deposits and the net capital requirements require Robinhood to carefully monitor liquidity.  This can be particularly challenging for any broker-dealer during periods of volatility.  But the purpose of these requirements is simple—to protect investors.  (*Id.* ¶ 15.)

## II.    Robinhood's Response to Unprecedented Trading Volatility.

The week of January 25 to 29, 2021 presented unprecedented challenges to Robinhood's ability to satisfy its obligations to clearinghouses.  That week, the financial markets experienced extreme levels of volatility and unprecedented volume, well outside the bounds expected in the ordinary course of business.  For example, on January 27, 2021, the Chicago Board Options Exchange Volatility Index, or "VIX", spiked by 62%, a dramatic increase that the Wall Street Journal reported was the third-largest percentage daily gain since 1990.[3]

During this period, Robinhood observed that a number of specific securities were subject to particularly rapid price fluctuations, including GameStop Corp. ("GME"), whose stock opened on January 22, 2021 at $42.59 per share, rose to $76.79 by the end of January 25, 2021, and then spiked to $347.51 per share at market close January 27, 2021, a 716% increase over four trading days.  In response to these securities' price volatility, beginning on January 25, 2021, RHF (the Robinhood introducing broker) began proactively increasing the stocks' margin maintenance requirements to 100%—requiring purchasers to pay for their

---

[3] Quentin Webb, *Volatility Index Soars*, Wall St. J. (Jan. 27, 2021, 10:43 PM), https://www.wsj.com/livecoverage/amc-gamestop-stock-market/card/G0TKmyrTdokxPNjwtwje.

shares in full—to begin to mitigate the risks that extreme market volatility posed to both the company and investors.  (Declaration of Shiv Verma ("Verma Decl.") ¶ 10.)  RHF also limited the number of options contract for these stocks that could be acquired on Robinhood's platform to ensure that RHF and RHS could sufficiently apply their capital to serve *all* of its customers.  (*Id.*)

This surge in volatility and volume also led to a surge in clearinghouse-mandated deposit requirements.  (*Id.* ¶¶ 11-12; Swartwout Decl. ¶¶ 25-26.)  From January 25 to 27, 2021 alone, the NSCC increased RHS's deposit requirements by several hundred million dollars, which RHS met.  (Verma Decl. ¶ 11.)  In response, Robinhood strengthened its cash position by drawing down on an existing line of credit from January 25 to 28, 2021.  (*Id.* ¶ 18.)

Then, early in the morning on January 28, 2021, Robinhood's operations team was notified that the NSCC had again responded to the immense volatility in the markets, this time increasing RHS's deposit requirements by more than $3 billion.  (*Id.* ¶ 12; Swartwout Decl. ¶ 25.)

A substantial portion of the increased deposit requirement was due to NSCC's value-at-risk ("VaR") calculation for specific stocks, including GME and AMC Entertainment Holdings, Inc. ("AMC").  (Verma Decl. ¶ 13; Swartwout Decl. ¶ 26.)  To mitigate this sudden increase, Robinhood proposed that, as a temporary measure, it would limit customer purchases for certain volatile stocks driving the increased deposit requirements.  (Verma Decl. ¶ 13; Swartwout Decl. ¶ 26.)  Robinhood left available the option for customers to sell their positions, a "position closing only" restriction.  (Verma Decl. ¶ 14; Swartwout Decl. ¶ 27.)

The purchase restrictions were a necessary, but difficult step, which RHS instructed RHF to take to protect the company, its customers and the markets. Following this preventative measure, the NSCC lowered the deposit requirement for January 28.  (Verma Decl. ¶¶ 15-16; Swartwout Decl. ¶ 28.)  While the balance

remained hundreds of millions of dollars above typical levels, Robinhood immediately paid all such requirements that morning.  (Verma Decl. ¶ 13; Swartwout Decl. ¶ 26.)  RHS was therefore able to meet its deposit requirements and serve its growing customer base.  (Verma Decl. ¶ 14; Swartwout Decl. ¶ 27.)

Beginning after market close on January 28, 2021, Robinhood began taking steps to ease the restrictions that it had placed on the most volatile stocks.  (Swartwout Decl. ¶¶ 30-32.)  Rather than marking the relevant tickers "position closing only," Robinhood set a maximum number of shares or options contract for each customer on a security-by-security basis, providing customers with an opportunity to buy the impacted securities, albeit with caps.  (*Id.*)  RHM also raised approximately $3.4 billion in additional capital from private investors between January 28 and February 1, 2021, $1 billion of which it contributed to RHS so RHS could further reduce trading restrictions.  (Verma Decl. ¶¶ 17-21.)

Robinhood did not take any of the above steps at the behest, or for the benefit, of any third party.  (Verma Decl. ¶¶ 22-24; Swartwout Decl. ¶¶ 33-34.)  Nor did Robinhood take these steps to protect any positions it held on its own account in the relevant securities.  Robinhood did not hold any short positions in any of the "meme" stocks during the relevant time period.  (Verma Decl. ¶ 25; Swartwout Decl. ¶ 35; Bain Decl. ¶ 35.)

The measures described above were not unique to Robinhood's platform during this period.  (Swartwout Decl. ¶ 29.)  The SEC released an investor alert and bulletin on January 30, 2021, titled *Thinking About Investing in the Latest Hot Stock? Understand the Significant Risks of Short-Term Trading Based on Social Media*, which not only warned retail investors of the risks of short-term investing in a volatile market, but also made clear that broker-dealers

> may reserve the ability to reject or limit customer transactions.  This may be done for legal, compliance or risk management reasons, and is typically discussed in the customer account agreement.  In certain circumstances, broker-dealers may determine not to accept orders where

a transaction presents certain associated compliance or legal risks.

*See* SEC Statement.  This guidance was consistent with the rationale behind Robinhood's Customer Agreement trade restriction provisions, as discussed above. Indeed, the trading restrictions that Robinhood put in place were limited—just one week later, by February 5, 2021, Robinhood lifted *all* of the restrictions. (Swartwout Decl. ¶ 32.)

## LEGAL STANDARD

A temporary restraining order ("TRO") is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (citation omitted) (emphasis in original).  To obtain either a TRO or a preliminary injunction, a plaintiff must prove, by a clear showing, that:  (i) he is likely to succeed on the merits; (ii) he is likely to suffer irreparable harm in the absence of preliminary relief; (iii) the balance of equities tips in his favor; and (iv) an injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Where a plaintiff shows only "serious questions going to the merits", he must compensate by showing "a balance of hardships that tips sharply towards the plaintiff", along with the irreparable harm and public interest prongs.  *Brewer*, 680 F.3d at 1072 (citation omitted).  Any injunctive relief awarded "must be tailored to remedy the specific harm alleged".  *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) (emphasis omitted) (citation omitted).

The Ninth Circuit has also made clear that when "a party seeks mandatory preliminary relief that goes well beyond maintaining the status quo *pendente lite*", the court "should be extremely cautious".  *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir. 1984).  That heightened standard applies here. Plaintiff seeks an Order requiring Robinhood to accept all customer-requested

trades on its transaction platform absent a court or government order.  (Pl.'s Br. at 7.)  That is not the status quo.  *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (ordering affirmative steps "did not operate simply to preserve the status quo").  As the SEC's January 30, 2021 guidance confirms, Robinhood has always maintained the discretion to refuse to accept a transaction.  (*See* Bain Decl. ¶¶ 12-13; Bain Decl. Exs. C, D ¶¶ 5.F, 16.)

## ARGUMENT

## I.   PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS.

Plaintiff brings four legal claims.  Each fails for a variety of legal and factual reasons.  The first prong of the *Winter* test therefore favors denial.

### A.   Plaintiff's Securities Exchange Act Claim Fails.

Plaintiff claims that Defendants violated Sections 9(a), 9(d) and 9(i) of the Securities Exchange Act.  (Compl. ¶¶ 22, 43, 44.)  None of these claims supports an injunction.

#### i.   *Plaintiff Does Not Have a Viable Private Right of Action.*

A civil plaintiff can seek relief under the Exchange Act only with respect to those sections for which a private right of action was created. Section 9(f) of the Exchange Act creates potential civil liability for any person who "'willfully participates' in the manipulation of securities on a national exchange" in violation of one of Sections 9(a), 9(b) or 9(c).  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 211 n.28 (1976) (provision was then codified as section 9(e)).  This list notably excludes Sections 9(d) and 9(i), for which there is no private right of action.  Plaintiff therefore has no claim under sections 9(d) or 9(i).

Plaintiff also has no claim under Section 9(a).  While Section 9(f) provides a private right of action for violations of Section 9(a), it does so only for persons "*who shall purchase or sell any security* at a price which was affected by" the alleged violation of Section 9(a).  15 U.S.C. § 78i(f) (emphasis added).  Here,

Plaintiff does not allege he bought or sold a security at an inflated or deflated price; rather, he alleges Robinhood *prevented him* from buying certain securities. (Compl. ¶¶ 25-26.)  He therefore lacks standing under Section 9(f).  *See Richardson v. Shearson/Am. Express Co.*, 573 F. Supp. 133, 136 (S.D.N.Y. 1983) ("[P]laintiffs do not claim that they purchased or sold [a security] at a price that was affected by [defendant's] alleged violation of section 9.  Rather, they assert that [defendant's] conduct induced them not to sell the stock.  For this reason alone, Count IV [alleging a violation of Section 9(f)] must be dismissed.").[4]

    ii. *Plaintiff Cannot Prove Section 9(a) Market Manipulation.*

    Plaintiff's Exchange Act claim also lacks merit because (i) he fails to allege any conduct that courts consider manipulative under Section 9(a)(2); and (ii) he fails to allege sufficiently that Robinhood acted with scienter.

    (1) *Plaintiff Fails to Allege Manipulative Conduct.*

    By Plaintiff's own admission, actionable manipulation involves "deception of investors" (Pl.'s Br. at 6), and requires "a showing that the defendants took some action that was intended to mislead the investing public".  *Onel v. Top Ships, Inc.*, 806 F. App'x 64, 67 (2d Cir. 2020).

    Plaintiff does not allege such "deception" here.  Instead, Plaintiff concedes that Robinhood's stock purchase restrictions were publicly announced, noting in the Complaint that Robinhood's CEO discussed the restrictions publicly on television on the same day Plaintiff unsuccessfully attempted to buy BlackBerry stock.  (Compl. ¶ 28.)  Not mentioned in the Complaint are the facts that

---

[4] Plaintiff also alleges violations of Section 9(a)(6).  (Compl. ¶ 43; Pl.'s Br. at 12.)  A violation of Section 9(a)(6) requires "pegging, fixing, or stabilizing the price of such security in contravention of such rules or regulations as the Commission may prescribe".  15 U.S.C. § 78i(a)(6).  However, the SEC has repealed the rules (Rules 10b-6 to 10b-8) formerly issued under Section 9(a)(6) and replaced them with rules that apply only to underwriters and other offering participants.  *See* 62 Fed. Reg. 520 (Jan. 3, 1997).  Because there are no longer any SEC rules applicable to broker-dealers under Section 9(a)(6), Plaintiff has no claim under that section.

Robinhood publicly posted its restrictions on its website (Bain Decl. ¶ 29) and the restrictions were one of the most covered news stories of the year.[5]

The cases Plaintiff cites in support of his argument that Robinhood engaged in "manipulation" only underscore the extent to which Robinhood's conduct differs from the covert and deceptive conduct that courts have previously found to be manipulative. For example, Plaintiff cites *SEC v. Resch-Cassin & Co.*, 362 F. Supp. 964, 978 (S.D.N.Y. 1973) and *SEC v. Malenfant*, 784 F. Supp. 141, 142 (S.D.N.Y. 1992), both of which involve pump-and-dump schemes in which the defendants inflated the price of stock they owned through false and misleading statements in order to sell the stock later at a higher price. Each of these cases involved allegations that the defendant held a position in the relevant securities and used deceptive conduct to profit on those positions by tricking other market participants into engaging in their own purchases or sales. No such allegations exist here. Indeed, Robinhood did not hold a short position in any of the relevant stocks, and therefore did not stand to profit at all from a decrease in the relevant stock prices. (Verma Decl. ¶ 25; Swartwout Decl. ¶ 35; Bain Decl. ¶ 35.)[6]

Plaintiff does allege a conspiracy theory that Robinhood implemented trading restrictions beginning on January 28 at the behest, or for the benefit, of third parties such as Citadel Securities, which he incorrectly alleges has an ownership stake in Robinhood. (Compl. ¶ 12; Pl.'s Br. at 7.) This is nothing more than rank speculation, completely unsupported by any factual allegations and conclusively refuted by the sworn declarations submitted herewith. No third party

---

[5] *See, e.g.*, Joe Wallace, Amrith Ramkumar, Gunjan Banerji, *GameStop Mania Hits a Wall of Tighter Trading Terms*, Wall St. J. (Feb. 2, 2021, 6:06 PM), https://www.wsj.com/articles/silver-etf-at-center-of-reddit-fueled-surge-11612281290.

[6] *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787 (2d Cir. 1969), also cited by Plaintiff, involved a defendant that sought to prevent a corporate takeover by engaging in "extraordinary buying [of target company stock] . . . coupled with [] large secret sales off the market", *id.* at 793—a type of deception utterly absent here.

1    directed, or requested, that Robinhood implement the trading restrictions.  (Verma

2    Decl. ¶¶ 22-24.)  And, contrary to Plaintiff's allegations, Citadel does *not* hold any

3    ownership stake directly, or to Robinhood's knowledge indirectly, in Robinhood.

4    (Verma Decl. ¶ 23; Swartwout Decl. ¶ 34.)  These conspiratorial allegations and

5    claims of conflict of interest are "incomprehensible, conclusory statements about

6    harm, and [are] devoid of any facts or authorities to support Plaintiff's claims".

7    *McElroy v. Majchrzak*, No. EDCV 20-2228 (JGB) (PLAx), 2020 WL 7248373, at

8    *1 (C.D. Cal. Oct. 27, 2020).  "A preliminary injunction is an extraordinary and

9    drastic remedy", *id.*, and one that requires more than such "mere allegations of

10   wrongdoing".  *Maxlite, Inc. v. ATG Elecs., Inc.,* 2020 WL 6260007, at *2 (C.D.

11   Cal. July 13, 2020).

12          Finally, none of the claimed "deceptive" conduct is even alleged to

13   have affected the price of securities.  *See Jolley v. Welch*, 904 F.2d 988, 992 (5th

14   Cir. 1990) ("[S]ection 9 does not govern manipulative practices that do not directly

15   affect the market or purchase price of a security.");  *Jewelcor Inc. v. Pearlman*, 397

16   F. Supp. 221, 244 (S.D.N.Y. 1975) (same).  While Plaintiff contends that

17   Robinhood deceived its users "into believing that they were trading on a platform

18   adequately capitalized" and that Robinhood did not disclose that Citadel Securities

19   was a "major investor" in Robinhood (Pl.'s Br. at 7), Plaintiff does not even

20   attempt to show that these alleged misrepresentations or omissions actually

21   affected the price of any securities.  Rather, to the extent Plaintiff alleges that

22   Robinhood's conduct affected the securities market, it is only through the publicly

23   disclosed purchase restrictions Robinhood implemented.  (*See* Compl. ¶¶ 16-17.)

                    (2)    *Plaintiff Cannot Prove Scienter.*

25          Plaintiff's claim fails for the separate and independent reason that

26   Plaintiff cannot prove scienter, as required for a Section 9(a) claim.  *See Connolly

27   v. Havens*, 763 F. Supp. 6, 11-12 (S.D.N.Y. 1991).  In fact, because the scienter

28

---

1    element is subject to the heightened pleading requirements of Rule 9(b) and the

2    Private Securities Litigation Reform Act of 1995, s*ee* Fed. R. Civ. P. 9(b); 15

3    U.S.C. § 78u-4(b)(2)(A), this claim will not even survive a motion to dismiss.

4            Plaintiff contends that he can satisfy the scienter requirement by a

5    showing of mere negligence.  (Pl.'s Br. at 9-10.)  The 50-year-old precedents

6    Plaintiff cites for this contention have been overruled.  Section 9 of the Exchange

7    Act "contains a state-of-mind condition requiring something more than

8    negligence"—specifically, it requires a showing of "willful[] participat[ion]" in the

9    manipulation of securities.  *Ernst & Ernst*, 425 U.S. at 211 n.28; *see also Dekalb*

10   *Cty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 403 (2d Cir. 2016) (same).

11           Robinhood implemented temporary purchase restrictions as a risk

12   mitigant to reduce the amount of the clearinghouse deposit requirement and ensure

13   the stability of its trading platform.  (Verma Decl. ¶¶ 26-28; Swartwout Decl.

14   ¶¶ 25-28.)  It did not do so to benefit itself, and it did not do so at the behest, or for

15   the benefit, of any third-party.  (*See* Verma Decl. ¶¶ 22-25; Swartwout Decl. ¶¶ 33-

16   35.)  Contrasted against these sworn statements, Plaintiff offers nothing more than

17   conclusory allegations.  (*See, e.g.*, Compl. ¶ 18 ("Robinhood's actions were done

18   purposefully and knowingly to manipulate, or with reason to know, that its

19   customers would be harmed and without employing any reasonable protections for

20   its retail investor customers affected . . . .").)  These are insufficient.  *See In re Wet*

21   *Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1157 (C.D. Cal. 2007) ("[P]laintiffs

22   cannot allege 'intent' in general terms or simply 'motive and opportunity' or

23   'recklessness,' but instead must 'plead, at a minimum, particular facts giving rise

24   to a strong inference of deliberate or conscious recklessness.'" (citation omitted)).

25       B.    Plaintiff's Computer Fraud and Abuse Act Claim Fails.

26           Plaintiff asserts a claim under Section 1030(a)(5)(A) of the Computer

27   Fraud and Abuse Act ("CFAA").  (Compl. ¶ 49.)  To prevail, Plaintiff must prove

28

that Robinhood (1) "knowingly" caused the "transmission of a program, information, code, or command" (2) to "intentionally" cause damage (3) "without authorization, to a protected computer". *See Thurmond v. Compaq Comp. Corp.*, 171 F. Supp. 2d 667, 675 (E.D. Tex. 2001); 18 U.S.C. § 1030(g) (private right of action for a violation of Section 1030). Plaintiff cannot do so.

*First,* Robinhood's purchase restrictions did not involve an actionable "transmission". Plaintiff's misunderstanding of how Robinhood's app works is apparent from his brief, where he asserts that "Robinhood transmitted a program, code, or command to Plaintiff's computer and smartphone device (and to those similarly situated) that disabled the 'buy' feature/button on its app." (Pl.'s Br. at 14.) As set forth in the Bain Declaration, that is simply untrue. When a customer uses the Robinhood app (or the web-based Robinhood interface) to make trades, the customer views information on Robinhood's servers. (Bain Decl. ¶¶ 27-29.) In implementing the purchase restrictions, Robinhood did not "transmit" a program, code or command to customers' smartphones or computers to alter the functionality of the app. To the contrary, it implemented the purchase restrictions in software and databases on its own servers. (*Id.* ¶ 31.)[7]

*Second*, Robinhood did not "damage" Plaintiff's computer or smartphone. The customer device, and the Robinhood app installed on that device, work just as before. The only change is to the cloud-based functionality available on Robinhood's own servers. (*Id.* ¶¶ 27-29.)

*Third,* any alleged "transmission" was not unauthorized within the meaning of the CFAA. *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 304 (6th Cir. 2011) (defining "without authorization" as used in CFAA

---

[7] It is for this reason that Plaintiff's citation to *United States v. Raisley* is unavailing. 466 F. App'x 125 (3d Cir. 2012). In that case, the defendant distributed a "malware" program, which installed itself (unbeknownst to their owners) on thousands of computers, which then launched a "Distributed Denial of Service" attack to render a webpage unavailable for its intended users. *Id.* at 127. There was no such unauthorized transmission (or damage) here.

as "without sanction or permission").  Plaintiff willingly downloaded the
Robinhood application himself, opened an account and agreed to the Customer
Agreement.  The Customer Agreement grants Robinhood the authority, "at any
time" and "without prior notice," to "prohibit or restrict" Plaintiff's "access to the
use" of the app or website.  (Bain Decl. Ex. D ¶ 16.)  It further permits Robinhood
to "prohibit or restrict" Plaintiff's "ability to trade", "refuse to accept any of"
Plaintiff's transactions, or "refuse to execute any of" Plaintiff's transactions.  (*Id.*);
*see also LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1135 (9th Cir. 2009)
(affirming dismissal of CFAA claim because, where an employee had permission
from his employer to use the computer, he did not access the computer "without
authorization").

C.   Plaintiff's Unfair Competition Law Claim Fails.

Plaintiff cannot show a likelihood of success on the merits of his
claim under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof.
Code § 17200, *et seq*., because (i) he lacks standing to bring such a claim, and
(ii) even if he had standing, his claim is doomed to fail on the merits.

i.   *Plaintiff Lacks Standing to Pursue His UCL Claim.*

"Standing under the UCL . . . is substantially narrower than standing
under Article III of the Constitution."  *Wright v. Gen. Motors Acceptance Corp.*,
545 F. App'x 686, 688 (9th Cir. 2013) (internal quotation marks omitted).  To have
standing to bring a UCL claim, "a plaintiff suing under the UCL must (1) establish
. . . *economic injury*, and (2) show that the economic injury was the result of, i.e.,
*caused by*, the unfair business practice . . . that is the gravamen of the claim."  *Id.*
(alterations in original) (citations omitted) (internal quotation marks omitted).

Plaintiff has not alleged a cognizable injury.  He alleges that he tried
to purchase AMC shares using the Robinhood app on January 28, 2021, and that he
tried to "access the 'buy' feature" for BlackBerry shares that same day.  (Cobos

Decl. ¶ 7.)  What he ignores is that he remained free to purchase these stocks from other broker-dealers.  Robinhood did not prevent—and could not prevent—Plaintiff from buying these stocks; it simply did not provide a means for him to buy those stocks through Robinhood.  Moreover, it is entirely speculative whether Plaintiff would have made or lost money if he had actually bought additional shares.[8]  *See Lanovaz v. Twinings N. Am., Inc.*, 726 F. App'x 590, 591 (9th Cir. 2018) ("A 'some day' intention[]—without any description of concrete plans . . . —does not support a finding of the 'actual or imminent' injury that Article III requires.") (alteration in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992)).

Plaintiff's allegations regarding his BlackBerry options contract fare no better.  If he had exercised his call option on January 28 (as he could have done had he spoken to a live broker), he would have immediately *lost* money as the stock was trading well below the strike price of $24.00.  (*See* Cobos Decl. ¶ 5; Cobos Decl. Ex. 2.)  That option remained out of the money when it expired the following day, and BlackBerry shares have not traded above $24.00 through filing.

ii.      *Plaintiff's UCL Claim Cannot Succeed on the Merits.*

Plaintiff likewise cannot show a likelihood of success on the merits of his UCL claim.  To state a claim under the UCL, a plaintiff must allege that the defendant engaged in an "unlawful, unfair or fraudulent business act or practice".  Cal. Bus. & Prof. Code § 17200.  Plaintiff cannot show any unlawful conduct.

*First*, as discussed above in Sections I.A and I.B, Plaintiff's claims under 15 U.S.C. § 78i(a) and 18 U.S.C. § 1030(a) are without merit, and thus cannot support a UCL claim.  *See Bejou v. Bank of Am.*, No. CV F 13-0125 LJO

---

[8] Plaintiff allegedly tried to purchase these stocks using the Robinhood app at a time on January 28 when they were trading at $7.92 (AMC) and $15.31 (BB).  (Cobos Decl. ¶ 6; Cobos Decl. Exs. 1-2.)  The Court can take judicial notice that these stocks closed on Monday, February 8, at $6.18 (AMC) and $13.76 (BB).

SMS, 2013 WL 1759126, at *5 (E.D. Cal. Apr. 24, 2013) ("Reliance on other invalid claims fails to support a viable UCL claim.").

*Second*, to the extent Plaintiff alleges separate liability under Section 9(d) or 9(i) of the Exchange Act, Plaintiff's claim also fails. Section 9(d) prohibits a person from manipulating a "short sale of any security". 15 U.S.C. § 78i(d). Plaintiff alleges that Robinhood's stock restriction prevented him from buying additional AMC stock, not shorting. (Compl. ¶ 25.) Customers cannot engage in short sales on the Robinhood platform. (Swartwout Decl. ¶ 4.) Moreover, Plaintiff does not allege that he suffered *any* loss as a result of a short sale by another market participant, and therefore lacks standing to bring such a claim.

Section 9(i) prohibits any person from violating "*such rules or regulations as the Commission may adopt*, consistent with the public interest, the protection of investors, and the maintenance of fair and orderly markets". 15 U.S.C. § 78i(i) (emphasis added). Plaintiff fails to cite any specific SEC "rules or regulations" that Robinhood allegedly violated that would give rise to liability. Instead, Plaintiff alleges generally that Robinhood's "suspension of purchasing was contrary to the rules and regulations requiring a fair and orderly market". (Pl.'s Br. at 13.) Such vague allegations are insufficient to survive a motion to dismiss, much less serve as a basis for obtaining temporary injunctive relief.

*Third*, to the extent Plaintiff alleges separate liability under Rule 5310 of the Financial Industry Regulation Authority ("FINRA"), Plaintiff's claim fails again.[9] Robinhood's decision to decline or limit trades does not violate Rule 5310. Rule 5310—the "Best Execution and Interpositioning" rule—applies to the level of care with which a broker-dealer must exercise with an *accepted* trade order. *See In the Matter of Scottrade, Inc.*, Exchange Act Release No. 58012, 93 S.E.C. Docket

---

[9] In addition to these grounds for why a UCL claim fails, it is well established that there is no private right of action for a violation of FINRA Rules. *See Gurfein v. Ameritrade, Inc.*, 312 F. App'x 410, 414 (2d Cir. 2009).

1550, 2008 WL 2510611, at *5 (June 24, 2008) ("By *accepting* an order, a broker-dealer impliedly represents that the order will be executed in a manner consistent with the duty of best execution." (emphasis added)).  In other words, the Rule applies to *how* a trade is executed, not to a broker-dealer's decision as to *whether* to execute a particular trade.  As Plaintiff concedes, RHF temporarily did *not* accept any purchase orders for either AMC Entertainment or BlackBerry stock.

> *Fourth,* Plaintiff cannot show any unfair or fraudulent conduct. As discussed above, Plaintiff's speculative conflict of interest allegation concerning Citadel Securities is refuted by the record evidence.  *See supra* Section II(A)(ii).

> iii.   *Robinhood's Lawful Acts Cannot Violate the UCL.*

By definition, lawful acts cannot violate the UCL.  *See Nuvasive, Inc. v. Cadwell Indus., Inc.*, No. 12CV3065 JLS (JMA), 2013 WL 12096625, at *5 (S.D. Cal. Nov. 4, 2013) ("[T]he UCL may not be used to impose liability for allegedly unfair practices that have been affirmatively declared to be lawful.").  Specifically, a UCL claim cannot succeed where the challenged conduct is an essential part of the company's business operations and is consistent with industry practices.  *See Byars v. SCME Mortg. Bankers, Inc.*, 109 Cal. App. 4th 1134, 1149 (2003) (holding that a lender's conduct did not violate the UCL because that conduct was "widespread and commonly used as a method to compensate mortgage brokers for services provided to borrowers and the lender").

> But that is all that is challenged here:  lawful acts undertaken by Robinhood that are consistent with industry practice to ensure compliance with clearinghouse requirements and SEC regulations.  (*See* Swartwout Decl. ¶¶ 25-29; Verma Decl. ¶¶ 12-16.)  These acts were explicitly permitted by the Customer Agreement (Bain Decl. ¶¶ 8-21), and the SEC confirmed in its January 30, 2021 Bulletin the right of broker-dealers to take such actions.  *See* SEC Statement.  Indeed, other broker-dealers also set purchase restrictions on the "meme" stocks.

---

OPPOSITION TO PLAINTIFF'S EX PARTE
APPLICATION FOR A TRO

CASE NO. 21-cv-00843-VAP-MRW

D.    <u>Plaintiff's Negligence Claim Fails.</u>

Plaintiff does not appear to rely on his negligence claim to support his Application, nor could he.  *See* Pl.'s Br. at 11-17 (arguing only the first three causes of action).  Plaintiff cannot show (1) the existence of a duty of care; (2) a breach of that duty; (3) proximate cause; or (4) damages, as are all required to prove a successful claim for negligence under California law.  *Peredia v. HR Mobile Servs., Inc.,* 25 Cal. App. 5th 680, 687 (2018).

Most fundamentally, Robinhood's duties to Plaintiff sound in contract, not tort.  *See Sheen v. Wells Fargo Bank, N.A.*, 38 Cal. App. 5th 346, 357 (2019) ("[T]he duties of care between parties who negotiate contracts are not governed by the law of tort.").  Here, the Customer Agreement permits Robinhood to restrict the ability to purchase certain securities.  (*See* Bain Decl. Ex. D ¶¶ 5.F, 16.)  A tort claim for conduct expressly permitted by contract is barred.  *See, e.g.*, *Mackell v. Wells Fargo Home Mortg.*, No. 16-CV-04202-BLF, 2017 WL 373077, at *8 (N.D. Cal. Jan. 26, 2017).  Moreover, every customer agrees that "My Account is self-directed" (Bain Decl. Ex. D ¶ 5.A), meaning that the customer is fully responsible for his or her own investment decisions and is not relying on any advice or recommendations from Robinhood.  To the extent that a broker-dealer owes any duty beyond its contractual relationship with its customer, it owes those duties only for each individual transaction it accepts and processes for the customer.  *See de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1302 (2d Cir. 2002) ("On a transaction-by-transaction basis, the broker owes duties of diligence and competence in executing the client's trade orders, and is obliged to give honest and complete information when recommending a purchase or sale. The client may enjoy the broker's advice and recommendations with respect to a given trade, but has no legal claim on the broker's ongoing attention.").  There is no duty to accept all trades for all customers at all times.

FINRA Rule 5310 does not save Plaintiff's negligence claim.  As noted above, the duty of best execution under FINRA Rule 5310 concerns only *how* an accepted trade is executed, not *whether* a broker will accept a trade.  *See id.*; *see also In the Matter of Scottrade*, 2008 WL 2510611, at *5 ("By *accepting* an order, a broker-dealer impliedly represents that the order will be executed in a manner consistent with the duty of best execution.") (emphasis added).  Robinhood did not accept any trades at issue.  FINRA Rule 5310 is irrelevant.

## II.   PLAINTIFF CANNOT CLEARLY SHOW IRREPARABLE HARM.

Plaintiff must demonstrate by a clear showing that he will suffer irreparable injury, and that the injury is likely and imminent, not remote or speculative.  *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *Brewer*, 680 F.3d at 1072.  Plaintiff fails to make a clear showing that he will suffer irreparable harm.  Indeed, he has failed to demonstrate any harm at all—past, present or future—and any alleged harm can be remedied by damages.

### A.   Plaintiff Has Not Demonstrated Past, Present or Imminent Harm.

Allegations of past harm cannot support an injunction; Plaintiff must instead articulate a threat of ongoing injury that is "likely" or "imminent".  *See Baldrige*, 844 F.2d at 675.  Prior to the market open on February 5, 2021, Robinhood lifted all of the temporary restrictions that it had previously put in place (Swartwout Decl. ¶ 32), mooting Plaintiff's assertion of imminent harm.  At this point, whether—and to what extent—Robinhood may again decide it is necessary to implement restrictions on any securities is entirely speculative, as is the question of whether any such limitations would relate to any securities that have anything to do with Plaintiff.

Moreover, Plaintiff's theory of imminent harm appears to be that restrictions (if Robinhood reinstates them in the future) might lead to "depressed" prices in certain securities.  (Pl.'s Br. at 12, 15, 17.)  This could only conceivably

1   harm Plaintiff with respect to securities he already held before the purchase

2   restrictions went into effect.  For the reasons discussed below, Plaintiff's

3   speculative, conclusory assertions of harm that he *might* suffer in the future are

4   insufficient to warrant a grant of injunctive relief.  *See Herb Reed Enterprises, LLC*

5   *v. Florida Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (a party seeking

6   injunctive relief may not rely on "unsupported and conclusory statements

7   regarding harm [the plaintiff] might suffer" in the future).

8        *First*, Plaintiff's theory is predicated on assuming that—if Robinhood

9   had not placed temporary restrictions on AMC (now lifted)—he *would have*

10   purchased AMC shares, those shares *would have* risen in value and then he *would*

11   *have* sold those shares for a profit.  Yet Plaintiff cannot show that he would have

12   purchased AMC shares at a low price, held them for the right amount of time and

13   then sold them at a higher price for a profit.  Any attempt to do so would simply be

14   with the benefit of hindsight.  Plaintiff could have *lost* money buying additional

15   AMC shares instead of *making* money.  The same will be true for any future

16   restrictions Robinhood may put in place.  Pure speculation about lost profits on

17   stock-market trading does not entitle Plaintiff to sweeping injunctive relief.  *See id.*

18        *Second*, Plaintiff cannot show that he was foreclosed (or is now

19   foreclosed) from carrying trades on the open market.  Nothing obligated Plaintiff to

20   trade on Robinhood's platform.  Robinhood was not an exclusive broker for any of

21   these stocks.  Plaintiff admits that "[o]ther retail customers at other brokerage firms

22   at the same time are and were permitted to purchase *or* sell the same stocks".

23   (Pl.'s Br. at 11.)  This alone defeats Plaintiff's Application.

24        *Third*, Plaintiff's theory of harm assumes that Robinhood's temporary

25   purchase restrictions moved the market price of those securities.  There is no

26   evidence that RHF, a single broker-dealer in the market for securities, has the

27   ability to move markets when investors could still purchase and sell shares through

28

---

OPPOSITION TO PLAINTIFF'S EX PARTE                    CASE NO. 21-cv-00843-VAP-MRW
APPLICATION FOR A TRO

other broker-dealers.  This thread of loosely-tied, speculative assertions is misguided, strains logic and certainly does not entitle Plaintiff to injunctive relief.  *See In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098-99 (9th Cir. 2007) ("[C]onclusory allegations are insufficient to establish irreparable harm.").

> B.  Any Alleged Harm Can Be Remedied with Damages.

Even if Plaintiff had shown that he has suffered or will suffer harm—which he has not—the only appropriate remedy would be damages.  "A plaintiff is not entitled to an injunction if money damages would fairly compensate him for any wrong he may have suffered."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 595 (1952) (Frankfurter, J., concurring).  Any injury that Plaintiff might suffer from the inability to trade securities on Robinhood's platform is ***monetary*** injury, which "is not normally considered irreparable".  *See Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) (holding it is "well established" that injuries in the form of lost revenue are not normally irreparable); *Bofi Fed. Bank v. Erhart*, 2016 WL 4680291, at *8 (S.D. Cal. Sept. 7, 2016) ("[E]ven if the Court considered a precipitous decline in stock price as irreparable harm, [Plaintiff] has not demonstrated a likelihood of suffering this harm again in the absence of a preliminary injunction."); *Sierra Military Health Servs., Inc. v. United State*s, 58 Fed. Cl. 573, 582 (2003) (same).

## III.  THE BALANCE OF THE EQUITIES FAVORS DEFENDANTS.

In considering whether to grant or deny injunctive relief, a district court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843-44 (9th Cir. 2007) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).

The balance of equities tips decidedly in favor of denying the requested relief.  Granting Plaintiff's requested relief would risk serious harm to

1   Robinhood's business, its customers, and the broader stock market.  It would

2   deprive RHF and RHS of the use of an important tool essential to the continued

3   operation of any broker-dealer.  RHS instructed RHF to impose certain temporary

4   purchase restrictions to mitigate risk in connection with its clearinghouse deposit

5   requirements.  This ensured continuity of operations on the Robinhood platform,

6   providing access to millions of customers to trading in thousands of securities.

7   (Swartwout Decl. ¶ 28; Verma Decl. ¶ 26.)  While the recent capital infusion and

8   use of purchase restrictions has helped RHS manage its clearinghouse deposit

9   requirements, enjoining Robinhood from exercising its discretion to limit trading in

10  volatile securities would impose an unlimited capital requirement on the business.

11  (Verma Decl. ¶ 27-28.)  No broker-dealer could possibly have the capital to

12  support limitless trades, especially in volatile securities.  Enjoining Robinhood's

13  ability to restrict trading in certain stocks that jeopardizes the continued operation

14  of the entire platform would risk serious harm to Robinhood's business and loss of

15  goodwill with its broker-dealers' customers—causing Robinhood irreparable harm.

16  *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir.

17  2001) (holding "threatened loss of prospective customers or goodwill certainly

18  supports a finding of the possibility of irreparable harm").

19          Indeed, granting the requested relief could force Robinhood into an

20  impossible Catch-22 scenario.  On the one hand, RHS could comply with this

21  Court's order and become the only broker-dealer in the United States that is

22  exposed to the risk of limitless collateral deposit requirements.  On the other hand,

23  RHS could act consistently with its Customer Agreement and SEC guidance by

24  exercising discretion to limit trades to ensure that it can meet all collateral deposit

25  requirements and net capital regulations (*e.g.,* Swartwout Decl. ¶¶ 26-29), but, in

26  doing so, violate the Court's order.

27

28

1    Simply put, RHS's discretion to instruct RHF to apply trading

2  restrictions is one tool that RHS uses to satisfy its obligations to the entire

3  Robinhood customer base, its clearinghouses and the SEC.  Removing that tool

4  would directly, and irreparably, interfere with those efforts.  *See John Labatt Ltd.*

5  *v. Onex Corp.*, 890 F. Supp. 235, 249 (S.D.N.Y. 1995) (finding that the balance of

6  hardships tipped in favor of defendants who were entitled to conduct their business

7  pursuant to Canadian law and regulations, and noting that granting the relief sought

8  "would superimpose another—potentially inconsistent—regulatory scheme on the

9  transaction").  By contrast, denial of the injunction would impose little, if any,

10  hardship on Plaintiff.  The temporary restrictions have already been lifted, and

11  even when they were in place Plaintiff was free to execute trades elsewhere.

12  (Swartwout Decl. ¶ 32.)

13  **IV.    A TEMPORARY RESTRAINING ORDER IS NOT IN THE PUBLIC**

14  **INTEREST.**

15    The sweeping relief that Plaintiff seeks would do far more harm than

16  good to the public, and the fourth *Winter* factor fails.  *Winter*, 555 U.S. at 20.

17    As described above, preserving Robinhood's discretion to impose

18  trading restrictions on volatile stocks benefits the public by ensuring stability for

19  the millions of Robinhood customers and, by extension, the entire market.  The

20  requested injunction would tie RHF's and RHS's hands from complying with other

21  broker-dealer requirements that help to protect the public interest, such as

22  restricting transactions in situations involving suspected insider trading or money

23  laundering.  Should the Court order the requested relief, RHS could find itself in

24  the position of having to choose between, on the one hand, violating clearinghouse

25  obligations and undermining the regulatory regime designed to protect the public

26  or, on the other, violating this Court's order.  That is not in the public interest.  *See*

27  *Video Gaming Techs., Inc. v. Bureau of Gambling Control*, 356 F. App'x 89, 94

28

(9th Cir. 2009) (finding that a preliminary injunction conflicted with the public interest where the injunction was inconsistent with gaming regulations).

The SEC and FINRA already inspect and regulate broker-dealers. The SEC has stated—*following media attention on Robinhood's actions*—that "broker-dealers may reserve the ability to reject or limit customer transactions." *See* SEC Statement. These agencies are best positioned to assess whether that discretion should be narrowed in the future.

## V. PLAINTIFF WOULD HAVE TO POST A BOND SUFFICIENT TO COVER ALL POTENTIAL HARM TO ROBINHOOD.

Plaintiff argues that he should be required to post only a nominal bond of $1,000 given the supposed absence of any harm to Robinhood. (Pl.'s Br. at 19.) Plaintiff is wrong on the facts and the law. Under Federal Rule of Civil Procedure 65(c), a "court may issue a preliminary injunction or a temporary restraining order *only* if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added); *see Moroccanoil, Inc. v. Zotos Int'l, Inc.*, 230 F. Supp. 3d 1161, 1179 (C.D. Cal. 2017) (requiring a bond in the amount of $250,000, taking into account the costs the defendant would incur). Plaintiff would have to post a bond of *at least* $3 billion, the incremental amount originally required by the clearinghouse before the trading restrictions were implemented. (Swartwout Decl. ¶ 25; Verma Decl. ¶ 12.) Plaintiff obviously cannot bond such an amount. The magnitude of such a bond confirms why the balance of hardships tilts so decidedly against an injunction.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the Application must be denied.

Dated:  February 8, 2021

By: _/s/ Naeun Rim_____

Naeun Rim
Grace W. Kang
BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS, LINCENBERG &
RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067
Tel: (310) 201-2100
Fax: (310) 201-2110
E-mail: nrim@birdmarella.com
E-mail: gkang@birdmarella.com

Antony L. Ryan (*pro hac vice pending*)
Kevin J. Orsini (*pro hac vice pending*)
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Tel: (212) 474-1000
Fax: (212) 474-3700
E-mail: aryan@cravath.com
E-mail: korsini@cravath.com

*Attorneys for Defendants Robinhood*
*Financial LLC, Robinhood Securities, LLC*
*and Robinhood Markets, Inc.*