1  Antony L. Ryan (*pro hac vice* pending)
       aryan@cravath.com
2  Kevin J. Orsini (*pro hac vice* pending)
       korsini@cravath.com
3  CRAVATH, SWAINE & MOORE LLP
   825 Eighth Avenue
4  New York, New York 10019-7475
   Telephone:  (212) 474-1000
5  Facsimile:  (212) 474-3700

6  Naeun Rim (State Bar No. 263558)
       nrim@birdmarella.com
7  Grace W. Kang (State Bar No. 271260)
       gkang@birdmarella.com
8  BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
   DROOKS, LINCENBERG & RHOW, P.C.
9  1875 Century Park East, 23rd Floor
   Los Angeles, California 90067-2561
10 Telephone:  (310) 201-2100
   Facsimile:  310-201-2110

*Attorneys for Defendants Robinhood Financial LLC;
Robinhood Securities, LLC; and Robinhood Markets, Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEVI COBOS, an individual on behalf of those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ROBINHOOD FINANCIAL LLC, a Delaware Corporation; ROBINHOOD SECURITIES, LLC, a Delaware Corporation; and ROBINHOOD MARKETS, INC., a Delaware corporation; and DOES 1 through 1000, inclusive,<br><br>Defendants. | Case No. 21-cv-00843-VAP-MRW<br><br>[Related Cases 2:21-cv-00835-VAP (MRWx); 2:21-cv-00837-VAP (MRWx)]<br><br>**DECLARATION OF SHIV VERMA**<br><br>Judge:  Hon. Virginia A. Phillips<br>Courtroom:  8A<br>Hearing Date:  February 10, 2021<br>Hearing Time:  10:00 A.M. |

I, Shiv Verma, declare as follows:

1. I am the Head of Treasury, Finance & Strategy and Investor Relations at Robinhood Markets, Inc. ("RHM"). I have been at Robinhood since 2018. In my position, I am responsible for treasury, finance and strategy, as well as investor relations. I report directly to Jason Warnick, the Chief Financial Officer of RHM. I have personal knowledge of the facts stated in this declaration, except for those matters stated on information and belief, and if called upon to do so, I could and would so testify.

2. I respectfully submit this Declaration in support of Robinhood's Opposition to Plaintiff's Motion for a Temporary Restraining Order.

**I. Background on Robinhood.**

3. RHM is a financial services company headquartered in Menlo Park, California. RHM wholly owns Robinhood Financial LLC ("RHF"), which acts as an introducing broker for its customers by taking their trade orders. RHF is headquartered in Menlo Park, California. RHM also wholly owns Robinhood Securities, LLC ("RHS"), which, as a member of SEC-registered clearinghouses, serves as a clearing broker for RHF. In that capacity, RHS executes customer orders received from RHF by routing them to market-makers and also clears and settles trades for RHF. RHS's headquarters is registered with FINRA and the SEC in Lake Mary, Florida. Throughout this Declaration, I refer to these three entities collectively as "Robinhood."

**II. Role As Head of Treasury.**

4. As Head of Treasury, my role is to manage RHM's liquidity. I also monitor RHF's and RHS's liquidity to ensure compliance with all regulatory and clearinghouse deposit requirements. My team and I monitor whether there is sufficient capital for Robinhood to serve its customers while also monitoring obligations to our counterparties and under the law. Accordingly, we are required

to monitor and engage with a number of market participants that, collectively, form the infrastructure that enables Robinhood customers to trade in financial markets.

### III. Monitoring Capital Requirements.

5. Broker-dealers are required to pay deposits to clearinghouses, such as the National Securities Clearing Corporation ("NSCC"). The deposit supports trades during the two-day settlement period (known as "T+2") in which the clearinghouse delivers the stock to the buyer and the funds to the seller. To calculate the deposit requirements, clearinghouses look at, among other things, a firm's customer holdings, including unsettled trades. They use a volatility multiplier, including looking at specific securities, to quantify their risk. The clearinghouse may assign additional charges to the broker-dealer's deposit requirement depending on value-at-risk ("VaR") calculations and the broker-dealer's available net capital.

6. Broker-dealers must also comply with certain net capital requirements under an SEC rule known as the Uniform Net Capital Rule.

7. Between the clearinghouse deposit requirements and the requirements of the Uniform Net Capital Rule, RHF and RHS are required to monitor available liquidity to ensure that they are balancing customer demands and their obligations to the clearinghouses and federal regulators.

### IV. Unprecedented Volatility and Volume in the Market.

8. During the week of January 25 to January 29, 2021, Robinhood saw a tremendous surge in demand for its services. Between January 28 and February 1, 2021, hundreds of thousands of users opened new Robinhood accounts.

9. During this period, there was also a significant surge in market volatility and volume, which triggered a large increase in clearinghouse-mandated deposit requirements. During the week of January 25, 2021, Robinhood's clearinghouse-mandated deposit requirements related to equities increased tenfold,

or 1,000 percent. Individual volatile stocks accounted for hundreds of millions of dollars in deposit requirements.

10. Robinhood monitored the stocks that were undergoing particularly volatile price swings and began to take proactive measures to ensure that it could support the trades in those particular stocks. For example, beginning on January 25, RHF began increasing its margin maintenance ratio for a number of these volatile stocks to 100 percent. RHF also began limiting the number of options contracts that customers could purchase on a security-by-security basis.

11. From January 25 to January 27, 2021, the NSCC increased RHS's deposit requirements by several hundred million dollars as a result of the increased volatility in the market and trading volume by Robinhood customers. RHS met those increased deposit requirements.

12. Early on January 28, 2021, RHS's operations team received its daily margin notice from the NSCC requesting an increase in RHS's deposit requirement for that day to more than $3 billion. This increase put RHS's deposit requirements an order of magnitude above typical levels. I understand that RHS's operations team promptly reached out to the NSCC to discuss the request. My role as Head of Treasury at RHM was to support RHS in financial calculations and planning.

13. In discussions with the NSCC, RHS learned that a substantial portion of the increased deposit requirement resulted from the NSCC's VaR calculation for specific stocks, such as AMC Entertainment Holdings, Inc. ("AMC") and GameStop Corp. ("GameStop" or "GME"). In addition, because RHS's VaR charge exceeded its net capital, the NSCC imposed an additional special charge. The NSCC notified RHS that the NSCC's Risk Committee was reviewing the system generated margin calls. As a way to mitigate the sudden increase in the NSCC deposit requirements, RHS proposed to the NSCC that, as a temporary measure, it would limit customer purchases for certain volatile stocks that had driven the increased deposit requirements. Based on the issues it was facing and

the discussions with the NSCC, RHS believed that these temporary restrictions would help mitigate the increase in its clearinghouse deposit requirements by eliminating or significantly reducing the special charge.  Within several hours of the discussion with NSCC concerning the temporary restrictions, the NSCC issued an amended margin call that removed the special requirement, leaving only the VaR charge of $1.4 billion.  By 10:00 a.m. Eastern Time on January 28, RHS deposited approximately $700 million in incremental deposit charges with the NSCC to meet the revised deposit requirement for that day.

14.    On January 28, 2021, RHS informed RHF that it would not accept purchase orders for certain volatile stocks that had driven the increased deposit requirements.  As noted, RHS imposed these measures in order to reduce the collateral deposits demanded by the NSCC to a manageable level, and RHS expected that these actions would lead to such a result.  To provide flexibility to customers with existing positions, RHF permitted customers to sell their positions—*i.e.*, a "position closing only" ("PCO") restriction.  As a result, RHF maintained trading continuity for Robinhood customers at market opening and enabled millions of customers to transact in thousands of other securities.

15.    The PCO limitations were a necessary step for RHS to take to protect the Firm, Robinhood customers, and the markets.  The temporary restrictions on specified securities helped RHS to comply with its clearinghouse deposit requirements in the face of unprecedented volatility and volume, thereby allowing the Firm to continue to serve Robinhood customers and comply with all trading requirements and regulations.  Nonetheless, broker-dealers like RHS may face increased deposit requirements from clearinghouses at any time, necessitating the continued need to monitor trading activity of volatile stocks.

16.    While the PCO limitations temporarily prevented customers from buying certain stocks, after market close on January 28, 2021, RHS informed RHF that it could take steps to ease the restrictions.  Rather than restrict certain stocks to

5

PCO trades, RHF permitted some additional purchases but set a maximum number of shares or options contracts on a security-by-security basis that a customer could purchase.

## V. Robinhood Draws On A Line of Credit and Raises Money From Investors.

17. To deal with the ongoing market volatility, Robinhood took actions to ensure it has sufficient funds to comply with deposit requirements and to serve its growing customer base. Such actions have ensured that customers continue to be able to trade freely in thousands of securities, and have allowed RHF to reduce the temporary restrictions on a small number of volatile securities that, as explained above, were necessary to protect the firm and its customers.

18. One way in which Robinhood increased capital was to draw on existing lines of credit, as is common in the normal course of operating its business. On January 27 to January 28, 2021, Robinhood drew on existing lines of credit.

19. Robinhood also raised capital from investors. Over the next several days, Robinhood raised approximately $3.4 billion, $1 billion of which it contributed to RHS. This fundraising was a strong sign of confidence from investors that will help Robinhood continue to build for the future and further serve its customers through the strong growth the company has seen this year.

20. RHS has applied the capital to support Robinhood customers' trades.

21. These additional funds, combined with the temporary restrictions, enabled RHS to continue to execute trades for its customers and to continue its mission to democratize finance for all by providing access to the financial markets to everyone.

### VI. No Citadel Entity or Other Third Party Was Involved In Robinhood's Decision-Making.

22. I am familiar with the recent rumors on social media and in the press suggesting that Citadel LLC ("Citadel"), a hedge fund, or Citadel Securities LLC ("Citadel Securities"), a market maker, has an ownership interest in Robinhood, and that Citadel or Citadel Securities played a role in Robinhood's decision to restrict trades of certain volatile stocks during the weeks of January 25 and February 1, 2021. These rumors and speculation are false.

23. Neither Citadel nor Citadel Securities has an ownership stake in Robinhood. I am unaware of any indirect ownership stake by Citadel or Citadel Securities in Robinhood.

24. To the best of my knowledge based on my involvement in the discussions concerning RHS's decision to apply these limited restrictions, no third party, including Citadel and Citadel Securities, requested that Robinhood apply restrictions on stock or options trading or played any role in RHS's decision to apply limited restrictions on stock and options purchases in certain securities.

25. As of January 27, 2021 and through the present, RHM did not hold, and has not held, short positions in GameStop, AMC or Blackberry, Ltd. I understand that no Robinhood customers held short positions in any of those securities through Robinhood, as the Robinhood app and website do not permit short selling.

### VII. The Need for Broker-Dealer Discretion Over Trading Restrictions.

26. I understand that the plaintiff in this action seeks a court order to require Robinhood to remove any trading restrictions or limitations on specific securities. Such an order would be dangerous for the financial system. If Robinhood were to lose the ability to temporarily restrict or limit trading in response to rapidly changing market conditions, it would be unable to protect

itself, its customers, and the markets during periods of significant volatility and enhanced risk.

27. As recent events make clear, in times of extreme volatility and high trading volume, collateral deposit requirements, which exist to protect investors, can increase significantly—including by hundreds of millions or even several billion dollars overnight.

28. The steps Robinhood has taken in recent days to draw on its line of credit and raise money from investors, as set forth above, have substantially increased RHS's net capital and liquid assets and thereby enable it to support customer trading in more extreme market conditions. Raising capital cannot be the only tool through which a broker-dealer can address stressed market conditions. Indeed, no amount of raised capital could support limitless T+2 settlement. Like any broker-dealer, Robinhood must have the ability to impose risk management measures like trading restrictions or limitations, if necessary, to address conditions of extreme market volatility.

I declare under penalty of perjury that the foregoing is true and correct.

Executed February 8, 2021, at Menlo Park, California.

*Shiv Verma*
_____
Shiv Verma