Antony L. Ryan (*pro hac vice* pending)
    aryan@cravath.com
Kevin J. Orsini (*pro hac vice* pending)
    korsini@cravath.com
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, New York 10019-7475
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

Naeun Rim (State Bar No. 263558)
    nrim@birdmarella.com
Grace W. Kang (State Bar No. 271260)
    gkang@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone:  (310) 201-2100
Facsimile:  310-201-2110

*Attorneys for Defendants Robinhood Financial LLC;*
*Robinhood Securities, LLC; and Robinhood Markets, Inc.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEVI COBOS, an individual on behalf of those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ROBINHOOD FINANCIAL LLC, a Delaware Corporation; ROBINHOOD SECURITIES, LLC, a Delaware Corporation; and ROBINHOOD MARKETS, INC., a Delaware corporation; and DOES 1 through 1000, inclusive,<br><br>Defendants. | Case No. 21-cv-00843-VAP-MRW<br><br>[Related Cases 2:21-cv-00835-VAP (MRWx); 2:21-cv-00837-VAP (MRWx)]<br><br>**DECLARATION OF JAMES SWARTWOUT**<br><br>Judge:  Hon. Virginia A. Phillips<br>Courtroom:  8A<br>Hearing Date:  February 10, 2021<br>Hearing Time:  10:00 A.M. |

I, James Swartwout, declare as follows:

1.      I am the President and Chief Operating Officer of Robinhood Securities, LLC ("RHS").  I have been employed at Robinhood since 2019.  In my position, I am responsible for sales operations and customer engagement issues.  I also manage RHS's operations team.  I have personal knowledge of the facts stated in this declaration, except for those matters stated on information and belief, and if called upon to do so, I could and would so testify.

2.       I respectfully submit this Declaration in support of Robinhood's Opposition to Plaintiff's Motion for a Temporary Restraining Order.

3.      Robinhood Markets, Inc. ("RHM") is a financial services company headquartered in Menlo Park, California.  RHM wholly owns Robinhood Financial LLC ("RHF"), which acts as an introducing broker for its customers by taking their trade orders.  RHF is headquartered in Menlo Park, California.  RHM also wholly owns RHS, which, as a member of SEC-registered clearinghouses, serves as a clearing broker for RHF.  In that capacity, RHS executes customer orders received from RHF by routing them to market-makers and also clears and settles trades for RHF.  RHS's headquarters is registered with FINRA and the SEC in Lake Mary, Florida.  Throughout this Declaration, I refer to these three entities collectively as "Robinhood."

4.      In my capacity as President and Chief Operating Office at RHS, I lead teams responsible for the margin lending, risk assessment of introduced customer accounts as well as order routing and best execution.  In the ordinary course of business, RHS monitors and adjusts requirements for customer margin restrictions and trading restrictions.  This includes removing symbols no longer eligible for trading at RHS.  In addition, RHS monitors market fluctuations and makes risk-based assessments for increases in initial margin and margin maintenance requirements as deemed appropriate by the business.  As a matter of course, RHS

does not permit trading in certain security equities, does not allow naked options, short selling of stock, trading in mutual funds, bonds and other securities.

**I.        Clearinghouse Deposits.**

5.        As broker-dealers, both RHF and RHS are registered with the U.S. Securities and Exchange Commission ("SEC"), and are members of the Financial Industry Regulatory Authority ("FINRA") and the Securities Investor Protection Corporation ("SIPC").  RHS is also a member of several clearinghouses and as such is bound by membership rules for the clearinghouses with which Robinhood transacts to fulfill customer orders.

6.        Specifically, our introducing broker, RHF, interfaces with customers to take their trade orders.  RHS then takes those orders from RHF and executes or routes them to other broker-dealers called market makers for execution.  Once the trades have been executed, RHS then submits them to clearinghouses for post-trade processing, including clearance and settlement.  Clearinghouses typically intermediate transactions between market participants through a process of continuous net settlement, becoming the guarantor of each transaction.  They also process payments and securities deliveries and maintain records of securities ownership.  Among their required functions in connection with clearance and settlement is to protect investors and the markets by making sure that participants like brokerage firms have sufficient funds available to settle the trades they have made for their customers and, in the event of a member failure, to mutualize risk. For stocks and exchange traded funds ("ETFs") in the United States, the main clearinghouse is the National Securities Clearing Corporation ("NSCC"), which is part of a larger clearing organization called the Depository Trust & Clearing Corporation ("DTCC").  For options in the United States, the main clearinghouse is the Options Clearing Corporation ("OCC").

7.        Securities clearinghouses are self-regulatory organizations overseen by the SEC.  The clearinghouses are required to have member rules, which are

approved by the SEC, to ensure, among other things, that members appropriately cover the potential credit risk to counterparties from customers' trades, which includes requiring members to deposit cash or securities at the clearinghouse to cover related settlement obligations.  A clearinghouse may ask its members to increase their deposits at times when the clearinghouse determines that they are submitting trades of a type or volume that the clearinghouse views as increasing overall risk.  The aim is to reduce the likelihood that the clearinghouse will be exposed to unsecured liabilities in the event of a member's failure and to mutualize risk among other members by permitting the clearinghouse to access their deposits to pay or replace contracts if a member fails.  As a clearing broker that is a member of the NSCC and OCC, RHS is subject to the NSCC's and OCC's cash deposit and collateral requirements, which may fluctuate based on the nature and volume of Robinhood's customers' trading activity and market volatility.

8.     After signing up and receiving approval to use Robinhood's app or website, customers may invest in listed stocks and ETFs without paying Robinhood any commission, across over 5,000 available securities.  In addition to stocks and ETFs, Robinhood customers may also get approved to trade options contracts using the Robinhood app or website.

9.     When a Robinhood customer buys or sells a security on the Robinhood app or website, the trade may appear to be executed nearly instantaneously.  But behind the scenes, the trade takes two days after the trade date to settle and involves clearinghouses.

10.     When a Robinhood customer buys or sells a security, RHF, as the introducing broker, sends the order to RHS, the clearing broker, which executes or routes the order for execution to a market maker and submits the resulting trade to a clearinghouse for clearance and settlement.  For equities, it takes two days for the clearinghouse to process the transaction and effect the related transfers of cash and securities between buyers and sellers.  This is known as "T+2" settlement,

denoting the trade date plus a two-day "settlement period."  To cover the open settlement risk during the settlement period, RHS is required to place a deposit at the clearinghouse to cover the risk until the trade "settles."

11.    The two-day period between execution and settlement creates a potential risk for the clearinghouse that either the buyer or the seller defaults on its obligation to complete the trade.  As the clearinghouse determines that the risk is increasing, a clearinghouse may increase the broker-dealer's required deposits.  To calculate the deposit requirements, clearinghouses look at a firm's customer holdings, including unsettled trades.  They use a volatility multiplier, including looking at specific stocks, to quantify their risk.  The clearinghouse may assign additional charges to the broker-dealer's deposit requirement depending on value-at-risk ("VaR") calculations and the broker-dealer's available net capital.  For example, if a broker-dealer's customers have submitted more orders to purchase than to sell a particular security and the price of the security that the broker-dealer's customers are buying is more volatile, then the resulting deposit requirement will generally be higher.

12.    In order to clear and settle customer transactions, each trading day by 10:00 a.m. Eastern Time, clearing brokers like RHS must satisfy the NSCC's deposit requirements, often referred to as margin, to support their customer trades during the settlement period.  Depending on a particular day's deposit requirement at the clearinghouse, RHS may be required to deposit additional money with the clearinghouse that day.  Clearinghouses can also require RHS to deposit additional money throughout the day.

13.    Ultimately, this system of clearinghouses and collateral requirements is designed to minimize risk in the financial system in the event a market participant becomes unable to pay for securities it has purchased or deliver securities it has sold between the time of purchase or sale and settlement.  The deposit requirements serve as a protection against the risk of these failures.

## II.     Net Capital Requirements.

14.     In addition to clearinghouse requirements, as broker-dealers, RHF and RHS are subject to SEC regulations that require broker-dealers to maintain certain levels of regulatory capital to ensure the ability to promptly satisfy their liabilities at all times.  The SEC's primary rule is generally referred to as the "Uniform Net Capital" rule, which sets forth a methodology for computing a broker-dealer's net capital, sets forth minimum net capital levels which must be maintained at all times, establishes notification requirements in the event that a broker-dealer's level of net capital falls below certain minimum thresholds, and sets restrictions on broker-dealer activities when capital falls below certain levels.  The Uniform Net Capital Rule functions as a net liquid assets requirement insofar as the rule recognizes only liquid assets as contributing to regulatory capital.

15.     The purpose of the Uniform Net Capital Rule is to protect customers, creditors and counterparties by preventing broker-dealer failures and ensuring that broker-dealers that do fail have enough liquid assets to satisfy claims promptly. The rule thereby serves to protect the financial system and ordinary investors.

16.     The Uniform Net Capital Rule imposes a "moment to moment" requirement, meaning that broker-dealers must ensure compliance with the rule at all times.  SEC and FINRA rules require notification when net capital falls below certain defined "early warning" levels.  The purpose of these notifications is to provide warning to regulators that the broker-dealer may be approaching a state where it would have insufficient liquid assets to support its customer trades, so that the regulators can consider intervening prior to bankruptcy.

17.     To ensure compliance with the Uniform Net Capital Rule, broker-dealers perform repeated net capital computations.  The calculation begins with the broker-dealer's ownership equity under Generally Accepted Accounting Principles ("GAAP").  The broker-dealer is then required to perform adjustments by deducting illiquid assets, and applying variable "haircuts" or charges to risky assets

such as securities to compensate for market and credit risks.  The resulting figure is the broker-dealer's regulatory capital.  This amount is then compared to various minimums based on the broker-dealer's types and volume of activity.

18.     If a broker-dealer were to fail to maintain specified levels of regulatory capital, that entity could be subject to immediate suspension or revocation of registration, which could lead to the liquidation of that broker-dealer's holdings on behalf of customers and eliminate the broker-dealer's ability to serve its customers.

### III.     RHS Enacts Limitations on the Exercise of OTM Options.

19.     As part of its ordinary operations, Robinhood tracks data concerning, among other things, customers' exercise of options contracts, a type of security available to Robinhood's customers.

20.     One type of options contract is a call option, which gives its owner the right, but not the obligation, to buy a specified amount of stock at a specified price (the "strike price") by a specific date (the "expiration date").  When a customer buys a call option, he or she is generally hoping that the stock price will rise above the strike price before the expiration date.  If the stock rises above the strike price, a call option is said to be in the money ("ITM").  The customer has the right to buy the stock at the strike price even though the stock is trading at a higher price in the open market.  By contrast, if the stock price is below the strike price at a particular time prior to expiration of the option, the option is out of the money ("OTM") at that time.  If the stock does not rise above the strike price by the time the option expires, there generally is no reason for the customer to exercise the call option, and the contract will simply expire by its own terms.

21.     Customers can also buy and sell put options.  A put option gives its owner the right, but not the obligation, to sell a specific amount of stock at a strike price.  If the price of the stock declines below the strike price, the put option is ITM, and it is profitable for the owner to exercise that option.

22.    In January 2021, Robinhood became aware that some customers were occasionally exercising OTM options, causing them to suffer losses immediately upon exercise.  This issue continued despite Robinhood's warnings and education available in-app and on its website.

23.    To prevent these unnecessary customer losses, RHS requested, and RHF implemented, a procedure requiring customers to speak to a live broker before exercising OTM options.  This requirement was intended to provide an opportunity for the broker to explain to the customer the downsides of exercising an OTM option.  This procedure remained in effect through Thursday, January 28, 2021.  Beginning on Friday, January 29, 2021, RHF stopped permitting customers to exercise OTM options altogether.

24.    At no time on or since January 27, 2021, did Robinhood restrict a customer's ability to exercise ITM options.

**IV.    The NSCC Demands Over $3 Billion In Additional Deposits.**

25.    Early on Thursday, January 28, 2021, RHS's operations team received its daily margin notice from the NSCC requesting a more than $3 billion increase in RHS's deposit requirement for that day.  This increase put RHS's deposit requirements an order of magnitude above typical levels.  RHS's operations team promptly reached out to the NSCC to discuss the request.

26.    In discussions with the NSCC, RHS learned that a substantial portion of the increased deposit requirement resulted from the NSCC's VaR calculation for specific stocks, such as AMC Entertainment Holdings, Inc. ("AMC") and GameStop Corp. ("GameStop" or "GME").  In addition, because RHS's VaR charge exceeded its net capital, the NSCC imposed an additional special charge. The NSCC notified RHS that the NSCC's Risk Committee was reviewing the system generated margin calls.  As a way to mitigate the sudden increase in the NSCC deposit requirements, RHS proposed to the NSCC that, as a temporary measure, it would limit customer purchases for certain volatile stocks that had

driven the increased deposit requirements.  Based on the issues it was facing and the discussions with the NSCC, RHS believed that these temporary restrictions would help mitigate the increase in its clearinghouse deposit requirements by eliminating or significantly reducing the special charge.  Within several hours of the discussion with NSCC concerning the temporary restrictions, the NSCC issued an amended margin call that removed the special requirement, leaving only the VaR charge of $1.4 billion.  By 10:00 a.m. Eastern Time on January 28, RHS deposited approximately $700 million in incremental deposit charges with the NSCC to meet the revised deposit requirement for that day.

27.     On January 28, 2021, RHS informed RHF that it would not accept purchase orders for certain volatile stocks that had driven the increased deposit requirements.  As noted, RHS imposed these measures in order to reduce the collateral deposits demanded by the NSCC to a manageable level., and RHS expected that these actions would lead to such a result.  To provide flexibility to customers with existing positions, RHF permitted customers to sell their positions—*i.e.*, a "position closing only" ("PCO") restriction.  As a result, RHF maintained trading continuity for Robinhood customers at market opening and enabled millions of customers to transact in thousands of other securities.

28.     The PCO limitations were a necessary step for RHS to take to protect the Firm, Robinhood customers, and the markets.  The temporary restrictions on specified securities helped RHS to comply with its clearinghouse deposit requirements in the face of unprecedented volatility and volume, thereby allowing the Firm to continue to serve Robinhood customers and comply with all trading requirements and regulations.  Nonetheless, broker-dealers like RHS may face increased deposit requirements from clearinghouses at any time, necessitating the continued need to monitor trading activity of volatile stocks.

29.     I understand that taking steps to place PCOs on selected volatile securities was not unique to RHS.  Certain other broker-dealers also placed

restrictions on certain volatile securities due to these unprecedented market conditions.

**V.      Subsequent Revisions to the Trading Restrictions.**

30.     In the following days, RHS revised the limitations on customer purchases of certain securities as market conditions permitted.  For example, as of February 3, 2021, RHS informed RHF that it would accept purchase orders for all securities except for AMC and GME—both of which customers could still purchase up to certain share and options contract limits.

31.     As of February 4, 2021, restrictions remained in place for only AMC (up to 5,500 shares; up to 5,000 options contracts) and GME (up to 500 shares; up to 500 options contracts).

32.     As of February 5, 2021, the temporary restrictions have been eliminated entirely.

**VI.     No Citadel Entity or Other Third Party Was Involved In Robinhood's Decision-Making.**

33.     I am familiar with speculation on social media and in the press suggesting that Citadel LLC ("Citadel"), a hedge fund, or Citadel Securities LLC ("Citadel Securities"), a market maker, played a role in RHS's decision to instruct RHF to restrict trades of certain volatile stocks during the weeks of January 25 and February 1, 2021.  This speculation is completely false.

34.     To the best of my knowledge, no third party, including either Citadel or Citadel Securities, requested that Robinhood apply restrictions on stock or options trading or played any role in connection with RHS's decision on January 28, 2021 to apply limited restrictions on stock and options trading in certain securities.  This was a decision I made on behalf of RHS and in consultation with my operations team at RHS and others at Robinhood.

35.     As of January 27, 2021 and through the present, RHS did not hold, and has not held, short positions in GameStop, AMC or BlackBerry, Ltd.  Nor did

DocuSign Envelope ID: 73CB3EA0-DE02-44CD-9946-4D5AF6A72148

Robinhood customers hold short positions in any of those securities through
Robinhood, as the Robinhood app and website do not permit short selling.

      I declare under penalty of perjury that the foregoing is true and correct.

      Executed February 8, 2021, at Lake Mary, Florida.

*James Swartwout*

_____

James Swartwout